12 P.3d 809

**WALDEN BOOKS COMPANY, dba Waldenbooks, Plaintiff–Appellee,**

v.

**Arizona DEPARTMENT OF REVENUE, Defendant–Appellant.**

**No. 1 CA–TX 99–0022.**

Court of Appeals of Arizona, Division 1, Department T.

Nov. 2, 2000.

Lewis and Roca, LLP By John P. Frank, Patrick Derdenger, Phoenix, Attorneys for Plaintiff–Appellee.

Tim Delaney, Acting Attorney General By Michael P. Worley, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellant.

## OPINION

NOYES, Judge.

¶ 1 The Arizona Department of Revenue ("ADOR") appeals from summary judgment for Walden Books Company, dba Waldenbooks, on ADOR's assessment of retail transaction privilege taxes on Waldenbooks' receipts from its Preferred Reader Program. The tax court concluded that the Preferred Reader Program amounted to "[s]ervices rendered in addition to selling tangible personal property," the receipts from which were excluded from Waldenbooks' tax base under Arizona Revised Statutes Annotated ("A.R.S.") section 42–5061(A)(2) (Supp.1999).[1] We reverse and remand with directions to enter judgment for ADOR.

¶ 2 Waldenbooks is a retail business that sells books, periodicals, and related merchandise throughout the United States. In March 1990, Waldenbooks began offering a Preferred Reader Program to customers. In return for a ten dollar annual fee, Program members received

1. An informational brochure service with sales promotion information, interviews with authors, and previews of upcoming titles;

2. Check writing privileges at any Waldenbooks store with no required identification other than the Program membership card;

3. Telephonic book ordering services using a toll-free number;

4. Sale merchandise offers available to members only;

5. A ten percent discount at all Waldenbooks stores on purchases of books and certain other merchandise; and

6. An additional purchase discount of five dollars for every one hundred dollars spent.

¶ 3 Program members received a card containing a membership number, an expiration date, and a bar code for electronic scanning. When members bought Program merchandise, they presented their card or membership number and paid the discounted price and applicable taxes. Although they had to pay the annual fee, Program members did not have to buy anything to remain in the Program.

¶ 4 In answering a request to admit the assertion, "You made the Program available to your customers in order to stimulate retail sales," Waldenbooks stated, "Admit, but with the following qualification: The program was primarily targeted to develop and increase customer loyalty, which in turn, would result in additional retail sales." In answer to another request for admission, Waldenbooks stated, "Waldenbooks will admit the following: Waldenbooks believed that the availability of a discount would increase the sale of all merchandise (practically all merchandise is covered by the program) through developing customer loyalty and repeat business by means of the total package of benefits provided by the program."

¶ 5 During the audit period of June 1989 through October 1992, Waldenbooks had Arizona sales of $60.24 million, thirty-eight percent of which was to the 65,700 Program members. After a 1992 audit revealed that Waldenbooks had not paid taxes on the $657,000 it received from sale of Program

---

1. During the audit period this section was designated as section 42–1310.01(A)(2). *See* 1997 Ariz. Sess. Laws, ch. 150, §§ 86–88, 178 (effective Jan. 1, 1999). We use the current numbering for all pertinent statutes throughout this opinion.

memberships, ADOR assessed Waldenbooks $40,568.35 in delinquent retail transaction privilege taxes and interest under A.R.S. section 42–5061(A). Waldenbooks protested the assessment, exhausted its administrative remedies, and eventually prevailed in the tax court. ADOR timely appealed. We have jurisdiction pursuant to A.R.S. section 12–2101(B) (1994).

¶ 6 Arizona Revised Statutes Annotated section 42–5008(A) (Supp.1999) levies "transaction privilege taxes"

> measured by the amount or volume of business transacted by persons on account of their business activities, and in the amounts to be determined by the application of rates against values, gross proceeds of sales or gross income, as the case may be, as prescribed by this article and article 2 of this chapter.[2]

The "retail classification" of the transaction privilege tax "is comprised of the business of selling tangible personal property at retail." A.R.S. § 42–5061(A). The rate for the retail classification is five percent of the "tax base." *See* A.R.S. § 42–5010(A)(1)(m) (Supp. 1999). The tax base equals "the gross proceeds of sales or gross income derived from the business." A.R.S. § 42–5061(A).[3]

¶ 7 Arizona Revised Statutes Annotated section 42–5001(4) defines "gross income" as "the *gross receipts* of a taxpayer derived from trade, business, commerce or sales and the value proceeding or accruing from the sale of tangible personal property *or service, or both*, and without any deduction on account of losses." (Emphases added.) "Gross receipts" are defined as

> the total amount of the sale, lease or rental price, as the case may be, of the retail sales of retailers, *including any services that are a part of the sales*, valued in money, whether received in money or otherwise, including all receipts, cash, credits and property of every kind or nature, and

any amount for which credit is allowed by the seller to the purchaser without any deduction from the amount on account of the cost of the property sold, materials used, labor or service performed, interest paid, losses or any other expense. Gross receipts do not include cash discounts allowed and taken nor the sale price of property returned by customers if the full sale price is refunded either in cash or by credit.

A.R.S. § 42–5001(7) (emphasis added). This definition of "gross receipts" applies to the retail classification only (with arguable exceptions not relevant here). *See Ebasco Servs., Inc. v. Arizona State Tax Comm'n*, 105 Ariz. 94, 97, 459 P.2d 719, 722 (1969) (interpreting former A.R.S. § 42–1301, as amended by 1960 Ariz. Sess. Laws, ch. 21, § 1, and 1968 Ariz. Sess. Laws, ch. 89, § 84).

¶ 8 Section 42–5061, which contains more than eighty exclusions or deductions from the retail tax base, provides as follows in subsection (A)(2): "The tax imposed on the retail classification does not apply to the gross proceeds of sales or gross income from … [s]ervices rendered in addition to selling tangible personal property at retail."

¶ 9 Waldenbooks relies on two propositions. First, it argues that, because the Program constituted intangible property rights rather than "tangible personal property" as provided in section 42–5061(A), gross income from sale of Program memberships was outside the retail classification. Second, and apparently in the alternative, it argues that, because the Program consisted of services, its gross income from sale of Program memberships was exempt from retail taxation under section 42–5061(A)(2) as "[s]ervices rendered in addition to selling tangible personal property at retail."

¶ 10 ADOR relies on *State Tax Commission v. Holmes & Narver, Inc.*, 113 Ariz. 165,

---

**2.** Sections 42–5001 to –5077 (1999 and Supp. 1999).

**3.** Section 42–5001(5) (Supp.1999) defines "[g]ross proceeds of sales" as "the value proceeding or accruing from the sale of tangible personal property without any deduction on account of the cost of property sold, expense of any

kind or losses, but cash discounts allowed and taken on sales are not included as gross income." Because the term "gross income" is potentially more encompassing than "gross proceeds of sales" as pertains to services, we treat "gross income" as definitive of the retail classification's tax base.

548 P.2d 1162 (1976), and *City of Phoenix v. Arizona Rent–A–Car Systems, Inc.,* 182 Ariz. 75, 893 P.2d 75 (App.1995), for the proposition that the retail tax base is not restricted to receipts from sales of tangible personal property at retail, but rather comprehends all receipts from the seller's business activities unless certain other conditions are met.

¶ 11 *Holmes & Narver* articulated a test for determining whether income from concededly non-taxable services (design and engineering) was part of a taxpayer's gross income from the contracting business. What has emerged as the three-part *Holmes & Narver* test was stated by that court as follows:

> The tax is on the contracting business, not merely on the form of a series of contracts performed in the pursuance of that business. Here that business is twofold: design and engineering, and construction. Where [1] it can be readily ascertained without substantial difficulty which portion of the business is for non-taxable professional services (design and engineering), [2] the amounts in relation to the company's total taxable Arizona business are not inconsequential, and [3] those services cannot be said to be incidental [4] to the contracting business, the professional services are not merged for tax purposes into the taxable contracting business and are not subject to taxation.

113 Ariz. at 169, 548 P.2d at 1166.

¶ 12 *Arizona Rent–A–Car Systems,* the only case to apply the *Holmes & Narver* test outside the prime contracting classification, did so in deciding whether income from concededly non-taxable services (sale of gasoline) was part of the personal property rental tax base in the Phoenix City Code. 182 Ariz. at 78–80, 893 P.2d at 78–80.[5]

¶ 13 We have no disagreement with *Holmes & Narver* and *Arizona Rent–A–Car Systems,* but we conclude that they do not apply to the "services" issues regarding the retail classification and statutes that are quite detailed about what is and is not exempt from taxation. Neither the contracting statute at issue in *Holmes & Narver* nor the personal property rental taxing ordinance at issue in *Arizona Rent–A–Car Systems* included a specific exclusion for receipts from certain related services, as the retail taxing statutes do. Income from "services that are a part of the sales," A.R.S. section 42–5001(7), is included in the retail tax base, while income from "[s]ervices rendered in addition to selling tangible personal property at retail," A.R.S. section 42–5061(A)(2), is not. To hold that the exclusion stated in section 42–5061(A)(2) applies only if the taxpayer passes the *Holmes & Narver* test would significantly amend the statute, which is a legislative function. *See* Ariz. Const. art. 4, pt. 2. We therefore hold that the *Holmes & Narver* test is inapplicable in determining taxability of services under the retail classification.

¶ 14 No similar statutory obstacle to applying the *Holmes & Narver* test exists, however, concerning the taxability of intangible discount purchase rights as distinguished from "services" sold by a retailer of tangible personal property. In our judgment that test should appropriately be applied in this case in determining whether Waldenbooks' membership fees attributable to the discount component of the Program constitute part of its gross income from the retail sales business. *Cf. Arizona Rent–A–Car Systems,* 182 Ariz. at 78–79, 893 P.2d at 78–79 (applying *Holmes & Narver* test to otherwise exempt gasoline sales).

¶ 15 Waldenbooks points out that it sells Program memberships separately from its books and other merchandise. Waldenbooks argues that under *Ebasco* this is sufficient by itself to prevent the inclusion of income from

---

4. The *Holmes & Narver* court used this term "in the sense that [the activities in question] are inseparable from the principal business and interwoven in the operation thereof to the extent that they are in effect an essential part of the major business." 113 Ariz. at 168, 548 P.2d at 1165.

5. The Arizona appellate courts' only reference to the *Holmes & Narver* test in a retail transaction privilege tax case was dictum in *Valencia Energy Co. v. Arizona Department of Revenue,* 191 Ariz. 565, 580, 959 P.2d 1256, 1271 (1998), regarding an issue on which the court had not granted review. *See id.* at 581, 959 P.2d at 1272. We therefore do not discuss that case.

non-taxable sales within the taxable gross income from the taxpayer's major business, regardless of whether Program membership sales are inconsequential as compared to Waldenbooks' book sales. Waldenbooks urges that the *Holmes & Narver* test applies only where a contract does not separately price its constituent parts and "was designed specifically by the court for that type of factual situation and should be restricted to that very specific contractual structure."

¶ 16 Waldenbooks is mistaken. We perceived no such limitation on the *Holmes & Narver* test when we applied it in *Arizona Rent–A–Car Systems.* Moreover, Waldenbooks points to nothing in the *Holmes & Narver* court's opinion that supports its contention: That court itself acknowledged uncertainty about "whether [the fee for design and engineering services] was fixed by the contract or established by Holmes & Narver's accounting methods." 113 Ariz. at 168, 548 P.2d at 1165. As ADOR points out, the amount of money Holmes & Narver was paid for its design and engineering services was easily determined, and the parties in fact stipulated to the precise sum. *See id.* The *Holmes & Narver* court expressly rejected the idea "that there is a difference for tax purposes between a project which the parties contemplate as a single undertaking but for which they enter into separate contracts for design and construction and that same project in which the parties combine these two functions into one contract but contemplate and do separately account and bill for design and engineering and construction services." *Id.* Neither the rationale of *Holmes & Narver* nor the applicability of the three-part test it prescribed depended on the absence of separate pricing within the contract before the court.

■ ¶ 17 The discount component of Waldenbooks' Program fails the *Holmes & Narver* test. The proportion of Program membership fees attributable to it cannot be readily ascertained and would largely be speculative. More importantly, it is undisputed that Waldenbooks' total Program membership fees amounted to an inconsequential 1.09% of its total Arizona sales for the audit period. Finally, Waldenbooks'

sales of discount purchase rights were incidental or "integral" to Waldenbooks' retail sales business in the sense that they were inseparable from that business and were interwoven in its operation to such an extent that they were in effect an essential part of it. *See id.; Arizona Rent–A–Car Systems,* 182 Ariz. at 79, 893 P.2d at 79. As ADOR correctly points out, the discount component of the Program was functionless standing alone. Members could take advantage of the intangible rights the discount program conferred only by buying covered Waldenbooks merchandise.

■ ¶ 18 Turning now to the "service" issue, we conclude that a service provided by Waldenbooks designed to encourage Program members to buy more merchandise is not a service "in addition to selling tangible personal property at retail." Waldenbooks admits that the Program is aimed at encouraging its members to purchase its merchandise. In an answer to an interrogatory, Waldenbooks stated, "The primary purpose of the program was to develop customer loyalty which in turn would increase sales by providing an incentive for customers to buy books at our stores instead of competitors' stores." Such incentives cannot rationally be characterized as separate and apart from the sale of tangible personal property at retail. Services intended to induce customers to buy more goods are not provided "in addition to" selling goods; they are "a part of the sales" of those goods, and are included in retail "gross income" via subsections 42–5001(4) and (7).

¶ 19 Waldenbooks relies on two cases: *Dine Out Tonight Club, Inc. v. Department of Revenue Services,* 210 Conn. 567, 556 A.2d 580 (1989), which is readily distinguishable, and a Tennessee case that is a memorandum decision and should therefore not have been cited. The taxpayer in *Dine Out Tonight Club* sold discount coupons that entitled the holder to free meals at participating restaurants. That taxpayer was not in the restaurant business and was therefore not promoting sale of its meals by selling coupons, in contrast to Waldenbooks, which promoted sale of its books by selling Program memberships. Furthermore, the closest Arizona

case to *Dine Out Tonight Club* was decided adversely to the taxpayer. *See Carriage Trade Management Corp. v. Arizona State Tax Comm'n,* 27 Ariz.App. 584, 557 P.2d 183 (1976) (holding that taxpayer who sold free-meal coupons was in the business of advertising, and its receipts were subject to the transaction privilege tax).

¶ 20 We do not discuss the unpublished Tennessee case relied on by Waldenbooks; we instead discuss Rule 28(c), Arizona Rules of Civil Appellate Procedure, which provides:

(c) **Dispositions as Precedent.** *Memorandum decisions shall not be regarded as precedent nor cited in any court* except for (1) the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case or (2) informing the appellate court of other memorandum decisions so that the court can decide whether to publish an opinion, grant a motion for reconsideration, or grant a petition for review. Any party citing a memorandum decision pursuant to this rule must attach a copy of it to the motion or petition in which such decision is cited.

(Emphasis added.) "A memorandum decision is a written disposition of a matter not intended for publication." ARCAP 28(a)(2).

¶ 21 ARCAP 28(c) makes it improper to cite unpublished decisions as authority. *See First Interstate Bank v. State Dep't of Revenue,* 185 Ariz. 433, 437, 916 P.2d 1149, 1153 (App.1995) ("Because [the cited case] is an unpublished decision, it is improper to cite it as authority, and we decline to consider it."), *abrogated on other grounds by Rogers Corp. v. State Dep't of Revenue,* 187 Ariz. 157, 158 n. 1, 927 P.2d 817, 818 n. 1 (App.1996); *Time, D.C. Freight Lines v. Industrial Comm'n,* 148 Ariz. 117, 118 n. 1, 713 P.2d 318, 319 n. 1 (App.1985) (stating that although a memorandum decision the administrative law judge had relied on was directly on point, it was not to be regarded as precedent or cited); *Asarco, Inc. v. Industrial Comm'n,* 122 Ariz. 241, 244, 594 P.2d 107, 110 (App.1979) (citing State Bar of Arizona Ethics Opinion No. 78–4 (Jan. 30, 1978)), *superseded by statute on other grounds as stated in Aguiar v. Industrial Comm'n,* 165 Ariz. 172, 175, 797 P.2d 711, 714 (App.1990).

¶ 22 In *Kriz v. Buckeye Petroleum Co.,* 145 Ariz. 374, 377 n. 3, 701 P.2d 1182, 1185 n. 3 (1985), the supreme court declined to consider a memorandum decision of the District Court of the District of Arizona. In rejecting the argument that the decision could be considered pursuant to both ARCAP 28(c) and Rule 201 of the Arizona Rules of Evidence (which allows "judicial notice of adjudicative facts"), the court stated:

We will treat memorandum decisions from the federal district court the same as memorandum decisions of our state courts. Furthermore, we do not believe judicial notice of memorandum decisions is warranted by Rule 201, Ariz.R.Evid., 17A A.R.S.

We will give no consideration to the memorandum decision [the third-party defendant] has cited.

*Id.*

¶ 23 We find no reason for out-of-state memorandum decisions to be more citable than in-state memorandum decisions. We hold that ARCAP 28(c) applies to memorandum decisions from any court.

¶ 24 The tax court erred by relying on A.R.S. section 42–5061(A)(2) to hold that Waldenbooks' Preferred Reader Program membership fees were excluded from its retail gross income as income from "[s]ervices rendered in addition to selling tangible personal property at retail ." The Program membership fees were taxable as "services that are a part of the sales," within the meaning of A.R.S. subsections 42–5001(4) and (7).

¶ 25 Reversed and remanded with directions to enter judgment for ADOR.

CONCURRING: JAMES B. SULT, Presiding Judge, and WILLIAM F. GARBARINO, Judge.