56 P.3d 686

**ENERGY SQUARED, INC.,**
**Plaintiff–Appellant,**

v.

**ARIZONA DEPARTMENT OF REV-
ENUE, an agency of the State of
Arizona, Defendant–Appellee.**

**No. 1 CA–TX 02–0004.**

Court of Appeals of Arizona,
Division 1, Department T.

Oct. 24, 2002.

Ryan, Woodrow & Rapp, P.L.C. by Frank
L. Migray, Phoenix, Attorneys for Energy
Squared, Inc.

Janet Napolitano, Attorney General by Mi-
chael P. Worley, Assistant Attorney General,
Phoenix, Attorneys for Arizona Department
of Revenue.

## OPINION

PATTERSON, Judge.

¶1 Energy Squared, Inc. ("the taxpayer")
appeals from summary judgment for the Ari-
zona Department of Revenue ("ADOR") on
the taxpayer's challenge to an assessment of
transaction privilege taxes imposed on the
business of leasing or renting tangible per-
sonal property for a consideration. *See* Ari-
zona Revised Statutes ("A.R.S.") section 42–
5071(A) (Supp.2001). ADOR made this as-
sessment on the theory that the taxpayer's
business of operating tanning salons amount-
ed to "renting" tanning beds and booths
within A.R.S. § 42–5071(A). The tax court
agreed. We do not, and therefore reverse.

## APPLICABLE FACTS

¶2 The taxpayer operates several tanning
salons in Arizona. Its customers come to the
salons to have their skin tanned through
exposure to ultraviolet ("UV") radiation.[1]
The salons maintain a variety of tanning beds
and booths that allow customers to tan for
different exposure periods, obtain tanning at
varying skin depths, and choose between red-
dish or brownish tans.

¶3 Excessive exposure to UV rays may
cause eye injury, skin damage and allergic
reactions. Repeated overexposure can cause
premature aging of the skin, dryness, wrin-
kling, and skin cancer. To provide tanning

---

1. The taxpayer's salons also sell tanning lotions,
lotion applicators, skin care products, eye protec-
tion, tee shirts, and other similar items. The
taxpayer pays transaction privilege taxes under
the retail classification on all such sales. These
taxes are not at issue in this litigation.

without burning, the taxpayer must determine the kind and amount of UV exposure to give each individual customer on each visit.

¶ 4 Due to regulations by the Federal Food and Drug Administration ("FDA") and the Arizona Radiation Regulatory Agency ("ARRA"), the taxpayer cannot allow its customers to determine their own periods of exposure to UV radiation. The FDA regulations impose maximum exposure times for each variety of tanning bulb based on the amount of UVB radiation that each emits; and the ARRA regulations require the taxpayer to limit each individual customer's use to the maximum exposure time recommended by the manufacturer of the tanning bed or booth.

¶ 5 Tanning results from the skin's exposure to UV rays. The UV ray is a combination of UVA and UVB rays in differing amounts varying from the phosphorous coatings inside the bulbs. Controlling the mix of UVA and UVB radiation and the exposure period is necessary to assure that a person receives a tan without burning or damaging his/her skin. The combination is determined by a tanning technician employed by the taxpayer. The customer does not select the exposure time or the type of bulb to be used. The taxpayer does not offer coin-operated tanning beds or booths that members of the public may use without supervision. A tanning technician must evaluate and authorize each customer prior to use of the taxpayer's tanning equipment.

¶ 6 The taxpayer's tanning technicians are trained in the functioning of tanning beds and booths and in the effects and benefits of exposure to UV rays. Training consists of a two-to-three-week correspondence course provided by the taxpayer, required examinations, and random quizzes during employment. Tanning technicians are responsible for preparing the tanning rooms before and after each customer's use and disinfecting, cleaning, and maintaining the tanning beds and booths. The tanning technicians must supply customers with sanitized protective eye wear. They likewise give the taxpayer's customers safety precautions and instruc-

tions on the proper use of the equipment, the functioning of different tanning units, and the way in which the differing levels of UV radiation from the different UV bulbs will affect them. The tanning technicians are also responsible for delivering the proper level of exposure and for setting the taxpayer's central computer and timer to the proper length of exposure for each customer.

¶ 7 The taxpayer has developed strict procedures that its tanning technicians must follow in determining the type and length of exposure to UV radiation for its customers. The taxpayer requires each customer to complete a form on his/her first visit. The form asks the customer about propensity to tan, regularity of sun exposure, tendency to sunburn, known allergies to sunlight, history of major sunburn, prior advice from a physician to stay out of the sun, and medications that could cause sunlight sensitivity. Each answer is assigned a numerical value, the sum of which determines the customer's skin classification.[2] From the resulting classification and the tanning technician's assessment of the customer's appearance and responses to the questions, the tanning technician determines the kind of bulb that may be used and the customer's initial exposure time.

¶ 8 Customers are limited to one tanning session per day. To ensure this, the taxpayer keeps a computer log for each customer indicating the date, time, and tanning technician for each session. Tanning technicians continue to monitor the customers' progress at each succeeding visit. A tanning technician reviews each customer's log on every visit. The technician may adjust the customer's exposure period or decline to provide further tanning based on his/her physical appearance or condition.

¶ 9 A new customer or one who has not been to the salon for some time is allowed no more than fifteen minutes of UV exposure. New customers, on average, receive no more than ten to twelve minutes of exposure, and some only receive six to eight. At each return visit the customer can get no more than two additional minutes of exposure de-

2. There are four classifications: Type 1 (always burns, never tans), Type 2 (always burns, some-times tans), Type 3 (sometimes burns, always tans), or Type 4 (never burns, tans easily).

pending on his skin's reaction to the previous tanning session. The maximum per-session exposure is twenty to thirty minutes depending on the tanning device used.

¶ 10 Following the determination of exposure time and type of bulb to be used, the customer is assigned to a tanning room or booth. A customer has no right to use a particular tanning room or booth. The customer is authorized to enter and occupy the assigned room or booth solely for the purpose of tanning.

¶ 11 Once inside, the customer may lock the tanning room for privacy and security. The taxpayer's tanning technician then inputs the exposure time into a computer attached to a timing device. The timing device is located at the front desk of the salon under the tanning technician's control. UV exposure commences five minutes after the technician starts the timer for the pre-determined exposure time, or when the customer presses a button on the tanning bed, whichever occurs earlier.[3] The customer cannot lengthen his/her UV exposure time beyond that set by the tanning technician.

¶ 12 No employee of the taxpayer is present in the tanning room with the customer during the UV exposure. The tanning session ends automatically when the pre-set time expires. The customer may opt to terminate the session early by pressing a button on or close to the tanning bed.

¶ 13 Customers purchase tanning sessions from the taxpayer in several ways. They may purchase individual sessions, minute packages, weekly or monthly packages, and annual or indefinite-length memberships. No charges are based upon results obtained. Additionally, the tanning protocol with the UV-generating bulbs can determine some charges. The taxpayer does not promise its customers any certain results and has a no-refund policy.

## PROCEDURAL BACKGROUND

¶ 14 ADOR audited the taxpayer's records for the period of March 1, 1997 through June 30, 1998, and classified the taxpayer's non-sales business activities as leasing or renting tangible personal property for a consideration within A.R.S. § 42–5071(A), and assessed delinquent transaction privilege taxes. The taxpayer properly exhausted its administrative remedies and filed a complaint and notice of appeal in the tax court. On cross-motions for summary judgment, the tax court ruled for ADOR. From formal judgment in accordance with the tax court's ruling, the taxpayer timely appealed. We have jurisdiction pursuant A.R.S. §§ 12–2101(B) (1994) and 42–1254(D)(5) (Supp.2001).

## ANALYSIS

### Standard of Review

■ ¶ 15 The relevant facts in this case are undisputed. Resolving the appeal depends on determining the meaning of A.R.S. § 42–5071(A) and applying it to the facts. When the interpretation and application of a statute controls the result, our review is *de novo.* *Wilderness World, Inc. v. Dep't of Revenue,* 182 Ariz. 196, 198, 895 P.2d 108, 110 (1995); *Hampton v. Glendale High School Dist.,* 172 Ariz. 431, 433, 837 P.2d 1166, 1168 (1992).

### A.R.S. § 42–5071(A)

■ ¶ 16 The dispositive question in this appeal is whether the taxpayer's use of its tanning beds and booths in generating gross income constitutes the taxable business of leasing or renting tangible personal property for a consideration.

¶ 17 The taxpayer argues that, because of its significant participation in and control over the delivery of UV radiation exposure to its customers, it does not give its customers the requisite control over the tanning devices to constitute "renting" within A.R.S. § 42–5071(A). The taxpayer argues that its business activities are analogous to rendering personal services through the use of equipment that remains effectively within its own control.

---

3. The optional five-minute delay allows the customer time to disrobe, apply tanning lotions, get into the tanning bed, move the top canopy or door to the level specified by the manufacturer, and put on protective eye wear.

¶ 18 In contrast, ADOR contends that the essence of the taxpayer's business is allowing its customers to use its various tanning devices for an agreed period of time in exchange for a specified fee and thus amounts to "renting" those devices for a consideration within § 42–5071(A). ADOR denies that the taxpayer's concomitant activities are "services." It urges that the taxpayer's customers do not engage the taxpayer to do any work for them and that the taxpayer's activities are aimed only at limiting its own potential liability and ensuring that its customers do not exceed the maximum exposure times specified by the manufacturers of the tanning devices that the customers pay to use.

¶ 19 Although both sides' characterizations of the taxpayer's business activities are reasonable and plausible, two considerations lead us to prefer that offered by the taxpayer.

¶ 20 First, the question whether the legislature intended activities like those of the taxpayer to fall within A.R.S. § 42–5071(A) is not clear. Uncertainty about the scope and meaning of a taxing provision is to be resolved in favor of the taxpayer and against the taxing authority. *City of Phoenix v. Borden Co.*, 84 Ariz. 250, 252–53, 326 P.2d 841, 843 (1958) (any doubts about meaning of statute that imposes tax are to be determined in taxpayer's favor); *accord Shamrock Foods Co. v. City of Phoenix*, 157 Ariz. 286, 288, 757 P.2d 90, 92 (1988).

¶ 21 Additionally, our supreme court has made it clear that the scope and application of A.R.S. § 42–5071(A) and its predecessor hinges on the degree of control over the property in question that is ceded to its putative "lessee" or "renter." *See State Tax Commission v. Peck*, 106 Ariz. 394, 476 P.2d 849 (1970). *Peck* dealt with the analogous question whether the business of coin-operated self-service laundries and car washes constituted leasing or renting tangible personal property for a consideration. To resolve this issue, the *Peck* court adopted a dictionary definition of the verb "to rent":

Webster's Third International Dictionary defines the verb "to rent" as "(1) to take and hold under an agreement to pay rent," or "(2) to obtain the possession and use of a place or article for rent." *Id.* at 396, 476 P.2d at 851. The court determined that:

There is no question that when customers use the equipment on the premises of the plaintiffs herein, such customers have an exclusive use of the equipment for a fixed period of time and for payment of a fixed amount of money. It is also true that the customers themselves exclusively control all manual operations necessary to run the machines. In our view such exclusive use and control comes within the meaning of the term "renting" as used in the statute.

. . . .

[T]he operation of plaintiffs' businesses is characterized by the lack of personal services provided by the owner.

*Id.*

¶ 22 The business activities of the taxpayer in this case do not meet these criteria. The taxpayer's customers do not "themselves exclusively control all manual operations necessary to run" the tanning beds or booths in question. They may select within a five-minute window when the tanning session begins and may terminate it early. By design, however, the question whether a tanning session may be commenced at all, and the question of how long the tanning session may last, are in the exclusive control of the taxpayer's tanning technician. The question of which particular tanning device is appropriate is also significantly within the technician's control. In sum, the "exclusive use and control" by the customer that *Peck* determined to be the essence of "renting" within the taxing statute is not present here.

¶ 23 We likewise disagree with ADOR's assertion that the service component of the taxpayer's business is merely illusory. Persons who patronize coin-operated laundries and car washes know what they want and how much of it they want, and need no help in using the available equipment to get it. The same is not true of the tanning salon customer. He knows he wants a particular type of tan and does not want to burn, but typically knows nothing about how to get what he wants using the taxpayer's equip-

ment. To protect both the customer and itself, the taxpayer must obtain information from the customer that it knows to be relevant, assess the information and the customer's condition and appearance, advise the customer about whether his goals can be met and which equipment is most likely to do so safely. It also determines the maximum exposure to UV radiation that the customer can be allowed to undergo, and enforces that determination through automated central control of the selected tanning equipment. This cannot reasonably be characterized as a transaction in which the taxpayer merely sells to its customer for a fixed amount the exclusive use of tangible personal property for a fixed period of time. *Cf. City of Phoenix v. Bentley–Dille Gradall Rentals, Inc.*, 136 Ariz. 289, 292, 665 P.2d 1011, 1014 (App. 1983) (owner of earthmoving equipment that used it to do excavation work for another using owner's own operators did not cede control of equipment and therefore was not "renting" it within the City of Phoenix's rental business privilege tax classification).

¶ 24 ADOR argues that:

Energy Squared's control is no greater than the control that the owners had in *Peck*, and arguably less because Energy Squared's equipment does not require heat or water. The owners in *Peck* controlled the utilities and had the power to interrupt any use their customers made of the washing machines. But Energy Squared is no more engaged in the business of interfering with its own transactions than the taxpayers in *Peck* were. Energy Squared transfers possession of its property to its customers for a fee, and its customers use that property in the manner intended without any interference from Energy Squared.

¶ 25 We do not agree. Unlike the owners of coin-operated, self-service laundries and car washes, the taxpayer customizes each of its patrons' use of UV-radiation-generating devices to maximize customer safety and optimize tanning results according to the customer's wishes. It is true that the owner of a coin-operated, self-service laundry or car wash may have the raw power to interrupt its customer's use of its equipment. In the instant case, however, the taxpayer reserves overall control over its customers' use of tanning devices not merely by virtue of its control over its premises, but rather as a part of the business design by which it provides artificial tanning. The fact that the taxpayer does not guarantee any particular results to its customers does not diminish the nature of its activities as services directed toward accomplishing such results.

¶ 26 ADOR cites our decision in *Walden Books Co. v. Department of Revenue*, 198 Ariz. 584, 588, ¶ 18, 12 P.3d 809, 813 (App. 2000), for the proposition that services such as the taxpayer's that cannot stand alone as a business activity will not be treated as separate from related taxable activity for transaction privilege tax purposes. *Walden Books* is inapposite here. There we held that sales of the right to buy merchandise in the future at a discount, which were designed to encourage store loyalty and additional merchandise sales, constituted "services that are a part of the sales" within the definition of "gross receipts" in A.R.S. § 42–5001(7) (Supp.2001). In contrast to the situation in *Walden Books*, here the taxpayer performs the service of providing artificial tanning. Far from being "ancillary" to the "rental" of tanning beds or booths, this service is the essence of the taxpayer's enterprise.

## CONCLUSION

¶ 27 We find that the tax court erred in determining that the taxpayer's business activities constituted leasing or renting tangible personal property for a consideration. Accordingly, we reverse the judgment with directions to enter judgment in favor of the taxpayer.

¶ 28 The taxpayer requests an award of attorneys' fees in the tax court and on appeal under A.R.S. § 12–348. We grant the request for fees on appeal pursuant to A.R.S. § 12–348(B), subject to the limitations imposed by A.R.S. § 12–348(E)(3) and (5), and compliance with Arizona Rule of Civil Appellate Procedure 21 and remand to the tax court for a determination of the amount of attorneys' fees for the tax court proceedings.

CONCURRING: ANN A. SCOTT TIMMER, Presiding Judge and G. MURRAY SNOW, Judge.