166 P.3d 934

**ARIZONA DEPARTMENT OF REVENUE, Plaintiff–Appellee,**

v.

**ORMOND BUILDERS, INC., Defendant–Appellant.**

No. 1 CA–TX 06–0005.

Court of Appeals of Arizona, Division 1, Department T.

Sept. 13, 2007.

Terry Goddard, Attorney General By Lisa A. Neuville, Assistant Attorney General, William A. Richards, Assistant Attorney General, Phoenix, Attorneys for Plaintiff–Appellee.

Steptoe & Johnson, LLP By Patrick Derdenger, Bennett Evan Cooper, Dawn R. Gabel, Phoenix, Attorneys for Defendant–Appellant.

## OPINION

IRVINE, Judge.

¶ 1 This is an appeal from a judgment finding Ormond Builders, Inc. ("Ormond") liable for transaction privilege tax under the State prime contracting classification and a municipal construction contracting classification. The judgment held Ormond liable for $477,785.25 with interest due to the State, Navajo County, and Gila County and $107,967.53 with interest due to the City of Show Low. We find that Ormond was a taxable prime contractor but that its gross income derived from the business of prime contracting did not include the amounts it received to pay other contractors on behalf of the project owners. Therefore, we affirm the tax court's judgment in part, reverse it in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶ 2 The Arizona Department of Revenue's (the "Department") assessment arises out of Ormond's work for two Arizona school districts. Ormond entered into a Construction Management Agreement (the "Payson Agreement") with the Payson Unified School District No. 10 ("Payson"), dated August 30, 1995, relating to the construction of a multipurpose education facility and an elementary school. It later entered into a virtually identical Construction Management Agreement (the "Show Low Agreement") with the Show Low Unified School District No. 10 ("Show Low"), dated March 27, 1997, regarding additions to three existing schools and a new high school and gymnasium facility.

¶ 3 Both Payson and Show Low (the "Schools") hired Ormond to supervise and coordinate their respective construction projects because they lacked sufficient expertise and personnel to do it themselves. Both Schools entered into individual contracts with dozens of trade contractors, who are defined in the Agreements as "persons or entities entering into construction contracts with Owner for the performance of the Work." The Agreements also defined "Work" as "that part of the Project[s] to be performed by the Trade Contractors." The contracts with the trade contractors identified Ormond as a construction manager or "the individual or entity contracted by the owner to administer any and all work associated with the construction."

¶ 4 In its reply brief Ormond accepted as accurate the Department's description of Ormond's role as construction manager: "Ormond entered into contracts with the Schools that required it to supervise and coordinate the construction projects." Ormond's specific duties under the Agreements included developing time schedules; preparing budgets; monitoring and inspecting the performance of the trade contractors; maintaining full-time employees at the sites to coordinate and provide general direction of trade contractors' work; processing and reviewing change orders; assisting in obtaining all building permits; reviewing and processing applications by the trade contractors for progress and final payments; and assisting the Schools in determining substantial completion of the work. Both Agreements required Ormond to obtain liability insurance to protect the Schools from claims arising from operations of Ormond or any trade contractor. Ormond was also required to maintain commercial, general, automobile and umbrella liability insurance on both projects.

¶ 5 The Schools awarded the trade contracts after competitive bidding, and Ormond was not a party or signatory to any of the Payson trade contracts at issue here.[1] The

1. Ormond acted as a trade contractor with re- spect to at least one trade contract on each

Show Low trade contracts were signed by a district employee on behalf of the district as owner, and Ormond countersigned as "Construction Manager for the owner." In the Agreements, the Schools agreed to communicate with the trade contractors only through Ormond, but on occasion some School representatives did talk directly to the trade contractors. The trade contractors were also required to maintain insurance relevant to the project, including workers compensation insurance, employer liability insurance, general liability insurance and automobile insurance.

¶ 6 Although the trade contractors contracted directly with the Schools, they submitted their payment requests to Ormond, which processed and reviewed them. The Schools paid Ormond the amount due to the trade contractors, and Ormond deposited the funds in its own accounts before disbursing the funds to the trade contractors.

¶ 7 Ormond agreed to use its best efforts to complete the projects. In the Payson Agreement, Ormond also warranted that the trade contractors' work would "be of good quality, free from improper workmanship and defective materials, and in conformance with the drawings and specifications." It also agreed "to correct all Work defective in materials or workmanship for a period of one (1) year." The Show Low contract simply required Ormond to "coordinate Trade Contractor warranty repairs of defective materials" for one year.

¶ 8 The Schools' payments to Ormond fell into several categories. First, each School paid a construction manager fee equal to a percentage of the total budget amount for the project: 6.5% for Payson and 5.9% for Show Low. The total budget amounts for the projects exceeded $5,000,000 for Payson and $11,000,000 for Show Low. The construction manager fee expressly covered Ormond's general operating and overhead expenses of its principal office and its capital expenses. In both Agreements, Ormond represented that the project could be completed within the budget amount it identified and provided that its construction manager fee could be reduced if costs exceeded the estimate.

¶ 9 Second, the Schools agreed to pay certain of Ormond's costs associated with the projects, including costs incurred by Ormond for expenses not included in trade contracts; wages or salaries of Ormond's personnel when stationed at the sites; costs of permits, licenses, bonds, and insurance; costs of corrective work not provided for in the trade contracts; costs of debris removal; and costs incurred due to any emergency affecting the safety of persons or property. At least some of these items were separately stated in the payment applications included in the record before us as "General Conditions," totaling almost $1,000,000 for the two projects.

¶ 10 Third, the Schools specifically agreed to pay Ormond the amounts due to trade contractors for work performed pursuant to the trade contracts. Ormond was not responsible to pay the trade contractors unless and until it received the funds from the Schools.

¶ 11 It is undisputed that Ormond paid the transaction privilege tax on its construction manager fee. The tax court found that Ormond did not pay tax on the amounts it received to reimburse it for other costs incurred under the Agreements, but the record is not entirely clear on this point. Ormond did not pay tax on the monies it received to pay the trade contractors. After conducting an audit, the Department issued an assessment for unpaid taxes based upon all payments received by Ormond from the Schools, including amounts paid to Ormond to pay the trade contractors.

¶ 12 Ormond appealed to the Arizona Board of Tax Appeals (the "Board"). *See Ormond Builders, Inc. v. Ariz. Dep't of Rev.*, No. 1883–2002–S, 2003 WL 21850689 (Ariz. Bd. Tax App. May 15, 2003). The Board found that the trade contractors were prime contractors responsible for paying the transaction privilege tax on their own receipts. *Id.* at *2. Consequently, it held that Ormond was not taxable on its receipts that reimbursed it for amounts it paid to trade contractors, but was "liable only for tax attributable to its portion of the contract." *Id.* at *3.

project. It paid the applicable taxes on those receipts and those taxes are not in dispute.

¶ 13 The Department appealed pursuant to Arizona Revised Statutes ("A.R.S.") section 42–1254 (2006)[2] by filing a complaint in the tax court, which alleged that the Board's decision was in error to the extent it held Ormond "was not the prime contractor for the Payson and Show Low projects and, therefore, was not subject to tax under the prime contracting classification." In its answer, Ormond stated that it paid tax on its construction manager fee and its receipts as a trade contractor and those amounts "are not at issue in this proceeding." It denied, however, that "any amounts that flowed through it from the two school districts to the various trade and supply contractors on the jobs were taxable gross receipts or income ... under the prime contracting classification."

¶ 14 The tax court conducted a two-day bench trial and ruled for the Department based upon its findings of fact and conclusions of law. Thereafter, the parties conducted discovery and filed motions for summary judgment on what credit Ormond would receive for the transaction privilege taxes already paid by the trade contractors. Ormond alleged that the trade contractors had paid at least $440,000 of the assessed tax. The Department acknowledged that some tax on the project had been paid by trade contractors, but argued Ormond did not present satisfactory evidence to support most of its claimed tax payments. The tax court ruled that Ormond could receive credit only for $168,886 on the State assessment and $18,282.05 on the municipal assessment. This appeal followed.

## DISCUSSION

¶ 15 This court reviews de novo the tax court's construction of statutes and findings that combine facts and law, and reviews its findings of fact for clear error. *Hale v. Amphitheater Sch. Dist. No. 10*, 192 Ariz. 111, 114, ¶ 5, 961 P.2d 1059, 1062 (App.1998).

## I. Taxation Under State Law

### A. Background

¶ 16 Arizona imposes a transaction privilege tax on a "prime contractor's" gross income derived from the business of prime contracting. A.R.S. §§ 42–5008 (2006), – 5010, –5075 (Supp.2006).[3] Subcontractors who work for a taxable prime contractor are not taxed. A.R.S. § 42–5075(D). The parties ask us to apply this statutory scheme to Ormond's activities as a construction manager, which is a term that is neither used nor defined in the tax statutes.[4] Because Ormond's tax liability depends on the specific language of the statutes, we begin our analysis with the relevant statutes.

¶ 17 "Prime contracting" means "engaging in business as a prime contractor." A.R.S. § 42–5075(M)(5) (Supp.2006).[5] A prime contractor is:

> [A] contractor who supervises, performs or coordinates the construction, alteration, repair, addition, subtraction, improvement, movement, wreckage or demolition of any building, highway, road, railroad, excavation, manufactured building or other structure, project, development or improvement including the contracting, if any, with any subcontractors or specialty contractors *and who is responsible for the completion of the contract.*

A.R.S. § 42–5075(M)(6) (emphasis added). The term "contractor," in turn,

> is synonymous with the term "builder" and means any person, firm, partnership, corporation, association or other organization,

---

2. We cite to the current version of the statute. No material revisions have occurred since the tax periods at issue.

3. We cite to the current version of the statutes. No material revisions have occurred since the tax periods at issue.

4. It appears that even in the construction industry the term "construction manager" is not specifically defined. An industry website cited by Ormond distinguishes between "agency construction managers" and "at-risk construction managers" depending on the degree of commitment by the construction manager to guarantee the total price. *"What is Construction Management,"* Construction Management Association of America, http://cmaanet.org/cm_is.php (June 1, 2006).

5. We cite to the current version of the statutory definitions. No material revisions have occurred since the tax periods at issue.

or a combination of any of them, that undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does personally or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, excavation, manufactured building or other structure, project, development or improvement, or to do any part of such a project, including the erection of scaffolding or other structure or works in connection with such a project, and includes subcontractors and specialty contractors. For all purposes of taxation or deduction, this definition shall govern without regard to whether or not such contractor is acting in fulfillment of a contract.

A.R.S. § 42–5075(M)(2).

¶ 18 Subcontractors are not subject to tax if:

they can demonstrate that the job was within the control of a prime contractor or contractors ... and that the prime contractor ... is liable for the tax on the gross income, gross proceeds of sales or gross receipts attributable to the job and from which the subcontractor or others were paid.

A.R.S. § 42–5075(D). The Department's rules clarify the importance of determining whether someone is a prime contractor:

Effective January 1, 1979, only prime contractors are liable for the tax imposed under this classification.... For purposes of this rule, every person engaging in a contracting activity is considered to be a prime contractor unless it can be demonstrated to the satisfaction of the Department that he is not a prime contractor as determined by the definitions contained herein.

1. Subcontractors are exempt provided that such persons are not acting in the capacity of prime contractors. A subcontractor is considered to be a prime

contractor, and therefore liable for the tax, if:

a. Work is performed for and payments are received from an owner-builder.

b. Work is performed for and payments are received from an owner or lessee of real property.

Ariz. Admin. Code ("A.A.C.") R15–5–602(C). Under this scheme, if an owner hires a general contractor who in turn hires subcontractors, the general contractor is the taxable prime contractor.[6] If the owner does not hire a general contractor, but instead directly hires contractors who perform the same work as subcontractors, the contractors who have a direct relationship with the owner are taxable prime contractors.

¶ 19 Much of the complexity of this case arises from the differences in terminology between industry practices and the tax statutes. The key term in the statute is "prime contractor." In common practice the term prime contractor may be synonymous with general contractor, but not for Arizona tax purposes. All parties agree that under the tax statutes a contractor may be a taxable prime contractor without being a general contractor. Similarly, the statutes do not address the legal relationship between a principal and an agent, yet the relationships among an owner, contractor and subcontractors may determine where a tax will lie.

¶ 20 In this case, Ormond was hired as a construction manager to perform functions ordinarily performed by a general contractor, but its legal relationship with the Schools and trade contractors was unlike that of a general contractor. Ormond first argues that it was neither a contractor nor a prime contractor, so none of its gross income is taxable under the prime contracting classification. Ormond next argues that even if it was a prime contractor, it is not taxable with regard to payments to the trade contractors because it made those payments only as an agent for the Schools.

---

**6.** A general contractor is defined as "[o]ne who contracts for the completion of an entire project, including purchasing all materials, hiring and paying subcontractors, and coordinating all the

work.—Also termed *original contractor; prime contractor.*" Black's Law Dictionary 351 (8th ed.2004).

¶ 21 The Department responds that Ormond was a contractor and a prime contractor, and that being an agent is not inconsistent with either label. It also argues that Ormond's responsibility to complete its own Agreements with the Schools was enough to make it responsible for the trade contracts because the Agreements required Ormond to supervise and coordinate all the trade contractors.

¶ 22 We address two issues. First, was Ormond a prime contractor when it acted as a construction manager? Second, if Ormond was a prime contractor, which of its receipts are taxable as gross income derived from the business of prime contracting? We address each point in turn.

## B.  Prime Contractor

¶ 23 Ormond first argues that it cannot be a prime contractor because it was not a contractor. Under the statute, the term "contractor" is "synonymous with the term 'builder'" and refers to any person that "does personally or by or through others" construct any building or other structure, and "includes subcontractors and specialty contractors." Ormond argues that all its actions were taken as an agent for the Schools, so it was not acting as a contractor. We disagree.

¶ 24 We have previously stated that "the legislative history [of the term "contractor"] reflects an intent to tax those who we might traditionally consider to be 'contractors,' that is, those who for a consideration undertake to build for others." *SDC Mgmt., Inc. v. State ex rel. Ariz. Dep't of Rev.*, 167 Ariz. 491, 497, 808 P.2d 1243, 1249 (App.1991). Ormond entered into contracts with the Schools to personally or through its supervision of others build or alter structures. Its duties included more than simply representing the Schools in dealing with others. Ormond performed many of the functions that a general contractor would have

performed if the Schools had hired one. Ormond had the skill and experience to supervise subcontractors, check quality, and manage billing. As the construction manager, it did those things. Given that Ormond contracted to use its expertise to coordinate and supervise building for the Schools, we easily conclude that it was a contractor. *See also Granite Constr. Co. v. State ex rel. Ariz. Dep't of Rev.*, 168 Ariz. 93, 99–100, 811 P.2d 345, 351–52 (App.1990) (finding evidence that taxpayer participated in performing and superintending reclamation activities was sufficient to demonstrate taxpayer engaged in "contracting").[7]

¶ 25 Ormond's activities also fall within the statutory definition of prime contractor. Ormond's primary argument to the contrary is that it was not a "general contractor" and therefore was not responsible for the completion of *any* contract. The Department responds that Ormond was at least responsible for completing its own contracts with the Schools. We agree with the Department. Whether Ormond is taxable as a "prime contractor" under the statute does not depend on whether it was a "general contractor" as that term may be used in the industry. As Ormond readily admits, a construction project may not have a general contractor, and a contractor may be taxable as a prime contractor without being a general contractor. Here, Ormond agreed to do certain tasks and was compensated for doing so, both in the construction management fee and payments to reimburse it for costs it incurred. Therefore, Ormond was responsible for completing its own contracts to act as a construction manager, and in doing so it acted as a prime contractor.

¶ 26 The fact that Ormond's duties included acting as the Schools' agent does not change our analysis. In determining whether a person is a prime contractor we look to the specific statutory definition. Nothing in that definition excludes activities undertaken as an agent. As discussed below, Ormond's

---

7.  As evidence that supervising construction is not within the definition of "contractor" in the transaction privilege tax statute, Ormond points in its reply brief to the slightly different definition of "contractor" in the contractor licensing statutes. *See* A.R.S. § 32–1101(A)(3) (2002). Ormond did

not cite this statute in its opening brief and the Department did not raise it in its answering brief. We will not address arguments raised for the first time in the reply brief. *Long v. City of Glendale*, 208 Ariz. 319, 329 n. 6, ¶ 34, 93 P.3d 519, 529 n. 6 (App.2004).

status as an agent may affect whether payments to it are includible in its taxable gross income, but it does not affect whether it is a prime contractor. At times Ormond may very well have been acting as the agent of the Schools, but being an agent is not inconsistent with being a prime contractor.

¶ 27 Ormond also cites several Board decisions as holding that a construction manager is not a prime contractor.[8] Ormond reads too much into these decisions. Although the Board has held that trade contractors can be taxable as prime contractors when an owner hires a construction manager, the Board did not reach that result by finding a construction manager cannot be a prime contractor. Instead, the Board recognized what we recognize below, which is that under some circumstances payments to trade contractors are not taxable to the construction manager. The Board held that, in effect, the taxable gross income of the construction manager does not include payments to trade contractors. This is not the same as holding the construction manager is not a prime contractor.

¶ 28 Indeed, in *Jerry's Plumbing*, 1989 WL 105056, at *4, the Board expressly found the construction manager was a taxable prime contractor, but excluded the payments to the taxpayer trade contractor from the construction manager's gross receipts because they were paid as the owner's agent. Similarly here, Ormond's work as a construction manager makes it a prime contractor under the statute.

### C. Ormond's Gross Income Derived From the Business of Prime Contracting

¶ 29 The Department argues that Ormond's taxable gross income includes all amounts paid to it by the Schools, including amounts that Ormond was to and did pay the trade contractors on behalf of the Schools. It points to the undisputed fact that Ormond received the funds from the Schools and deposited them into its own account before disbursing them to the trade contractors. Because Ormond is a prime contractor, the Department argues, it is taxable on all of its gross receipts from the projects, including amounts used to pay subcontractors or trade contractors.

¶ 30 A prime contractor is taxable on its "gross proceeds of sale or gross income derived from the business." A.R.S. § 42–5075(B).[9] "Gross income" is defined as gross receipts of a taxpayer derived from trade or business. A.R.S. § 42–5001(4) (Supp.2006).[10] "[I]t is presumed that all gross proceeds of sales and gross income derived by a person from [a] business activity" are taxable "until the contrary is shown." A.R.S. § 42–5023 (2006).

¶ 31 Our courts have recognized, however, that the gross income of a prime contractor need not include all monies paid to it relating to a construction project. *Ebasco*, 105 Ariz. at 98, 459 P.2d at 723 ("We do not believe that this statute goes so far as to tax all activities of a corporation based on the fact that one of the activities engaged in is that of contracting."); *see also State Tax Comm'n v. Holmes & Narver, Inc.*, 113 Ariz. 165, 169, 548 P.2d 1162, 1166 (1976) (recognizing that although "the tax is to be measured by all of the business activity of the taxpayer rather than merely a part of it[,]" receipts from nontaxable services are "not contracting which is the business which is the subject of

---

**8.** *Mountain View Dev. Co. v. Ariz. Dep't of Rev.*, No. 442–86–S, 1987 WL 50027 (Ariz. Bd. Tax App. Jan. 14, 1987); *Jerry's Plumbing v. Ariz. Dep't of Rev.*, No. 473–86–S, 1989 WL 105056 (Ariz. Bd. Tax App. June 20, 1989); *Mackey Plumbing v. Ariz. Dep't of Rev.*, No. 752–90–S, 1991 WL 208836 (Ariz. Bd. Tax App. July 30, 1991); *Ormond Builders*, 2003 WL 21850689.

**9.** The definition of "gross proceeds of sales" refers to value from the sale of tangible personal property. Because the term "gross income" is potentially broader than "gross proceeds of sales," we treat "gross income" as definitive of

the prime contracting classification. *See Walden Books Co. v. Dep't of Rev.*, 198 Ariz. 584, 586 n. 3, ¶ 6, 12 P.3d 809, 811 n. 3 (App.2000) (holding the same for the retail classification).

**10.** The statutory definition of "gross receipts" has been held to apply only to the retail classification. *Walden Books*, 198 Ariz. at 586, ¶ 7, 12 P.3d at 811. Therefore, we apply "a reasonable and ordinary construction to that term." *Ebasco Servs., Inc. v. Ariz. State Tax Comm'n*, 105 Ariz. 94, 98, 459 P.2d 719, 723 (1969).

the tax[ ]"); *Ariz. State Tax Comm'n v. Parsons-Jurden Corp.*, 9 Ariz.App. 92, 94, 449 P.2d 626, 628 (1969) (holding procurement agreement was not a sales contract, but a purchasing agent contract). Consequently, to determine what receipts are includible in Ormond's gross income we must examine each of the categories of payments made by the Schools to Ormond under the Agreements.

¶ 32 Ormond first argues that its construction manager fees are not taxable. As noted above, Ormond conceded in its answer in the tax court that the tax on its construction manager fees was not at issue, so the issue was not argued before or decided by the tax court. Therefore, Ormond's claim regarding taxation of the construction manager fees is not properly before us.

¶ 33 Next, we consider Ormond's receipts for items such as the ones billed as "General Conditions," which were paid by the Schools to cover some of Ormond's costs relating to the projects. Neither party makes a separate argument on appeal regarding these items. We note, however, that these items were mentioned by the Department in its closing argument before the tax court and the tax court referred to them in one of its findings of fact. By finding that all of Ormond's receipts were taxable, the tax court implicitly found these items to be taxable. Therefore, because these items were at issue in the tax court, we conclude that they are at issue on appeal.

¶ 34 Ormond's only argument that would affect the tax on the "General Conditions" is its assertion that it was not a prime contractor. Because we reject this argument above, we find that Ormond's gross income derived from prime contracting includes the items billed as "General Conditions." Therefore, the tax court's judgment is affirmed to the extent the Department's assessment relates to these amounts.

¶ 35 This leaves the final and largest category of payments to Ormond—monies paid to it to pay the trade contractors. Ormond's primary argument is that the monies are not taxable receipts because it was acting as the Schools' agent in paying the trade contractors. In support of this argument it points to *Ebasco* and other cases that have recognized that the taxable gross income of a contractor does not necessarily include all monies that pass through the contractor's hands.

¶ 36 In *Ebasco*, the Arizona Supreme Court held that amounts paid by a utility for electric generation equipment were not gross income to its construction contractor because the contractor purchased the equipment in the name of the utility as its purchasing agent. 105 Ariz. at 95–97, 459 P.2d at 720–22. The court looked to the ownership of the property and found the property was never owned by Ebasco. The court declined to attribute ownership to Ebasco because "[t]here has been no change of ownership and this Court will not create such a legal fiction for the sole purpose of attaching tax liability." *Id.* at 96–97, 459 P.2d at 721–22; *see also Indigo Co. v. City of Tucson*, 166 Ariz. 596, 598–99, 804 P.2d 129, 131–32 (App. 1991) (holding construction loan draws were not gross income to a licensed contractor acting as a partner in a partnership).

¶ 37 Ormond argues that *Ebasco* shows that it can exclude these monies from its gross income if it was plainly acting as an agent of the Schools in paying the trade contractors. Just as Ebasco was acting as a purchasing agent, Ormond argues that it was simply a conduit between the Schools and the trade contractors. After carefully considering the contractual relationships among the Schools, Ormond, and the trade contractors, we agree.

¶ 38 The undisputed evidence from the Agreements, bid specifications, and warranties establishes that Ormond was not liable to the trade contractors for payment under their contracts with the Schools. The record reflects that Ormond was not a party or a signatory to any of the Payson trade contracts. Rather, the trade contractors each contracted directly with Payson. The district superintendent signed the contracts on behalf of the Payson school district as "Owner." A district employee signed the Show Low contracts on behalf of the district as owner, while Ormond countersigned as "Construction Manager for the owner." Ormond did not sign any of the change orders, which

were significant in number. *Ormond Builders*, 2003 WL 21850689, at *2.

¶ 39 The Department attaches great significance to Ormond's depositing of the funds from the Schools into its own account before disbursing them to the trade contractors. We agree that this fact is highly relevant because it shows direct financial dealings between Ormond and the trade contractors, and such dealings may be evidence that Ormond was legally responsible for the work of the trade contractors. Nevertheless, under the clear terms of their contracts the trade contractors could only look to the Schools if they were not paid. Although Ormond processed the payments and had short-term possession of the funds, it was doing so only as an agent of the Schools. As such, the amounts that simply flowed through its accounts before being paid to the trade contractors are not included in Ormond's taxable gross income.

¶ 40 As Ormond points out, escrow agents and payroll agents also deposit client checks in their own accounts in order to draw on funds when paying third parties. The mere fact that Ormond checked and verified the Schools' payment obligations does not distinguish it from those parties. The key point is that Ormond was not liable to the trade contractors for the payments.[11] Consequently, because Ormond received the disputed funds as the agent of the Schools, and used them to satisfy a legal obligation of the Schools, the funds are not includible in Ormond's gross income.

¶ 41 We emphasize that the payments from the Schools are not excluded from Ormond's gross income because the Agreements obligate the Schools to reimburse Ormond's costs in paying the trade contractors. They are excluded because in paying the trade contractors Ormond was acting for the Schools by paying the Schools' legal obligations. This was not the case with other costs itemized in the Agreements that the Schools agreed to pay, such as the "General

Conditions." Even if the Schools agreed to reimburse Ormond's costs, if it was Ormond itself that incurred the obligation to pay, payments with respect to such items will generally be includible in Ormond's gross income.

¶ 42 The Department next argues that Ormond was not an agent because it agreed to assist in assuring that the work would be completed within the respective Schools' budgets. This is, again, certainly relevant to show the relationship between Ormond and the other participants in the project. Nevertheless, the Department does not contend that Ormond was at risk for cost overruns as a general contractor would be. Although Ormond agreed to reduce its fee if the projects went over budget, this financial penalty falls short of an assumption of the trade contractors' duties under their contracts. If a trade contractor failed to perform, the Schools were at risk, not Ormond.

¶ 43 The Department also points to Ormond's agreements regarding warranties as showing it was acting as more than an agent in paying the trade contractors. The Payson Agreement included Ormond's agreement to "correct all Work defective in materials or workmanship for a period of one (1) year." The Show Low Agreement required Ormond to coordinate warranty repairs. Each of the Agreements shows that Ormond had contractual obligations to the Schools, thus supporting our conclusion that Ormond was a prime contractor with regard to its own duties under the Agreements. But each falls short of an assumption by Ormond of the trade contractors' duties under the trade contracts. If a trade contractor walked off the job, leaving its work incomplete but not defective, we do not read the Agreements as requiring Ormond to finish the work at its own expense. Ormond's job as construction manager would certainly include minimizing this risk to the Schools, but at the end of the day it was the Schools that carried the risk.

---

11. Conversely, a prime contractor who is legally responsible for paying subcontractors cannot escape tax by having the owner of a project pay the subcontractors directly without the funds going through the prime contractor's hands. *See Arcon Constr. Co., Inc. v. Ariz. Dep't of Rev.*, No. 1624–

96–S, 1998 WL 181807, at *2 (Ariz. Bd. Tax App. March 9, 1998) (upholding an assessment on a prime contractor for amounts paid directly to subcontractors by the owner because the prime contractor constructively received the payments).

¶ 44 The Department contends that excluding from Ormond's gross income the amounts it received to pay the Schools' obligations to the trade contractors will result in an "administrative nightmare" because it will create severe difficulties in administering the tax. To avoid this, the Department argues that the statute should be interpreted to impose tax on the first party to receive payment from an owner.

¶ 45 We recognize that it is simpler to collect from and audit a single large taxpayer rather than dozens of small ones. Nevertheless, we are bound to apply the statutes as written. By taxing prime contractors, the Legislature may have hoped to limit the number of taxpayers because most projects would have a single general contractor who would be taxable as a prime contractor. But the statutes do not mandate a single prime contractor per project. *See Sec. Ins. Co. of New Haven v. Day,* 6 Ariz.App. 403, 406, 433 P.2d 54, 57 (1967) (finding contracting statutes do not "reveal any intention on the part of the Legislature to recognize the principle ... of one job, one general"). By imposing the tax on contractors who are "responsible for the completion of the contract," A.R.S. § 42–5075(M)(6), and exempting only those subcontractors who can demonstrate they worked on a job within the control of a taxable prime contractor, A.R.S. § 42–5075(D), the Legislature recognized that there may be more than one taxable prime contractor on a single project.

¶ 46 Likewise, the Department has determined that "[a] subcontractor is considered to be a prime contractor, and therefore liable for the tax, if ... [w]ork is performed for and payments are received from an owner-builder" or "from an owner or lessee of real property." A.A.C. § R15–5–602(C)(1)(a–b). The Department has enforced this position in its assessments against contractors who were hired directly by owners, even when the owner used the services of a construction manager, as shown in several Board decisions. *See Jerry's Plumbing,* 1989 WL 105056; *Mackey Plumbing,* 1991 WL 208836. Consequently, we cannot interpret the statutes to impose tax on activities that are not plainly taxable. *See Wilderness World, Inc. v. Ariz. Dep't of Rev.,* 182 Ariz. 196, 199, 895 P.2d 108, 111 (1995) ("Tax statutes are interpreted strictly against the state, and any ambiguities are resolved in favor of the taxpayer.").

¶ 47 In light of the record before us, we conclude that Ormond paid the trade contractors as the agent of the Schools. As a result, payments to Ormond to pay the trade contractors are not included in its gross income derived from the business of prime contracting. Therefore, we reverse the judgment in the Department's favor to the extent it affirmed the tax assessment relating to those amounts.

¶ 48 We cannot determine from the record before us how the Department's assessment is divided between Ormond's receipts used to pay trade contractors and other receipts, specifically the cost reimbursements billed as "General Conditions." Therefore, we remand the case to the tax court for further proceedings relating to this determination.

## II. Municipal Taxation

¶ 49 The Model City Tax Code § 415(a), as adopted by the City of Show Low (Code of the City of Show Low, Chapter # 8A), imposes a privilege license tax on "construction contracting." A "construction contractor" includes both "prime contractors" and "any person receiving consideration for the general supervision and/or coordination of such a construction project." Model City Tax Code § 100. Because the language of the municipal tax differs from the language of the State statute, we must separately analyze its applicability.

¶ 50 We have little difficulty determining that the scope of the Model City Tax Code's definition of "construction contracting" is at least as broad as the State law definition of "prime contracting." Under the facts of this case, we need not determine whether it is broader. For the reasons discussed above for finding that Ormond is a prime contractor, we also conclude that its activities as a construction manager constitute construction contracting under the Model City Tax Code.

¶ 51 We also conclude that Ormond is not taxable under the Model City Tax Code

for amounts that it received as a conduit for payments to the trade contractors. The definitions in the Model City Tax Code are broad enough to make the trade contractors taxable and there is nothing in the language of the Model City Tax Code that would lead us to conclude that a construction manager must pay tax for all the contractors involved in a project. As explained above, Ormond is taxable on its own receipts, but amounts that it paid on behalf of the Schools are not included in those receipts.

¶ 52 Therefore, we reverse the judgment against Ormond to the extent it includes municipal tax on the amounts it received to pay the trade contractors. As with the State tax, we remand to the tax court to determine if any of the municipal tax assessment relates to the other payments by the Schools to Ormond.

## CONCLUSION

¶ 53 We reverse the tax court's judgment to the extent it found Ormond taxable on its receipts that it used to pay the Schools' trade contractors. We affirm the tax court with regard to the tax liability relating to Ormond's other receipts under the Agreements. We award Ormond its costs and attorneys' fees on appeal in accordance with A.R.S. §§ 12–342 and –348(B) (2003), subject to its compliance with Rule 21(c) of the Arizona Rules of Civil Appellate Procedure.

CONCURRING: MAURICE PORTLEY, Presiding Judge and DIANE M. JOHNSEN, Judge.

