NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JESSYCA P., BRADON P., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.P., H.P., M.P., *Appellees*.

No. 1 CA-JV 15-0040
FILED 9-15-2015

Appeal from the Superior Court in Maricopa County
No.  JD510930
The Honorable Brian K. Ishikawa, Judge, Retired

**AFFIRMED**

COUNSEL

Gillespie, Shields, Durrant & Goldfarb, Phoenix
By DeeAn Gillespie, Geoff Morris
*Counsel for Appellant Mother*

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant Father*

Arizona Attorney General's Office, Tucson
By Erika Z. Alfred, JoAnn Falgout
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Kent E. Cattani and Judge John C. Gemmill joined.

---

**J O H N S E N**, Judge:

**¶1**    Jessyca and Bradon P. ("Mother" and "Father," respectively) appeal the superior court's order adjudicating the couple's son and twin daughters as dependent children. We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**    Mother and Father are the parents of a son, born in 2006, and twin daughters, born in 2010. In early 2013, Mother was under a doctor's care for treatment of fibromyalgia, depression and anxiety. Because of her condition, she required assistance with certain tasks, and her physician prescribed a part-time caregiver for her. The State paid Father to be her caregiver; at the relevant time, he was paid for 28 hours a week of care.

**¶3**    On the afternoon of March 20, 2013, Mother was alone with the children while Father was helping a friend move. She telephoned Father to say she was feeling light-headed; Father called 9-1-1. When responders arrived at the family's home, the two girls, nearly three years old at the time, were in a bedroom whose entry was blocked by two "pressure gates," one fastened atop the other. A television and a VCR were placed in the hallway so that the girls could see them from their room. When responders questioned him, the boy, then six-and-a-half, said the girls usually stayed in their room behind the gates for most of the day. He told responders that he slid food to the girls beneath the gates.

**¶4**    After responders arrived, Mother briefly lost consciousness, then was transported to the hospital, and released later that day. At trial more than a year later, a firefighter who waited at the home for Father's arrival after the ambulance left testified the girls were dressed, they were not crying, their hair was combed and they appeared clean and healthy. According to a paramedic who accompanied Mother to the hospital, the home was "unkempt" and dirt and dishes were everywhere.

**¶5**    After conferring upon their return to the stationhouse, the responders contacted what is now the Department of Child Safety ("DCS")

to report what they observed.[1]  Chief among their concerns was that they had found Mother home alone with the children, that she was using the gates to restrain the twins, that she seemed unable to care for the children, and an overall lack of cleanliness in the home.  When a DCS worker came to the home later that night, Mother told her that she was not able to care for her children due to her medical problems.

¶6        Two DCS caseworkers visited the home at 9:30 a.m. two days later and found Mother again alone with the children and the twins in their bedroom behind the double-stacked gates.  The caseworkers observed a "very foul odor" and saw that the home was "very dirty."  There was "food all over the home," and the boy was eating out of a fast-food restaurant bag he said had been in his bedroom from the night before.  A number of bottles and plates were on the floor near the television in the hallway outside the twins' room.  The caseworkers questioned the boy, who again said the girls often were kept in their room behind the gates, and that although the twins ate dinner with the rest of the family, they were fed breakfast and lunch through the gates in their bedroom.

¶7        The caseworkers removed the children from the home that day, and DCS filed a dependency petition on March 26, 2013.  The petition alleged Mother and Father were unable to parent their children due to neglect; it further alleged Mother was unable to parent due to health reasons and that Father was unable to parent due to failure to protect.

¶8        At a preliminary protective hearing on April 2, counsel was appointed for each of the parents and a guardian ad litem was appointed for the three children.  After the case was transferred to another superior court judge, Father exercised his right to notice that judge; the case then was transferred again.  At a status conference on August 13, the parties told the court they anticipated the hearing would require two half-days of testimony.  The court then set trial for February 18 and 19, finding that both parents "waive time" and "that extraordinary circumstances exist and that a delay would be indispensable to the interest of justice."  On the day that trial was to begin, however, the court continued the proceeding to May 2014 after DCS complained that Mother had yet to disclose material mental health records.  In its minute entry, the court found "that good cause exists to continue the trial because the State was not provided the information,"

---

[1]        Pursuant to S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted), the Department of Child Safety is substituted for the Arizona Department of Economic Security in this matter.  *See* ARCAP 27.

and further found "extraordinary circumstances exist and that a delay would be indispensable to the interest of justice."

¶9        Trial began on May 16, and continued on May 22, May 23, June 11, June 16, July 18, July 30 and August 5.  Proceedings scheduled for August 26 were postponed due to an emergency in Father's counsel's family and were postponed again due to extraordinary storm conditions on another occasion.  Further testimony finally was taken on October 29 and November 18.  In all, 23 witnesses testified.

¶10        After the parties filed post-trial briefs, the court issued its order granting the dependency on January 23, 2015.  The court found DCS had proved by a preponderance of the evidence that the girls "were neglected through the misuse and abuse of baby gates resulting in insufficient stimulation and supervision," that due to her medical condition, Mother required a caregiver, that Mother and Father had neglected the boy's "educational needs as he had an excessive amount of absences and unexcused absences," and that Father failed to protect the children by leaving them alone with Mother even though he knew that her "medical condition/limitations prevent[ed] her from safely parenting on her own." "Return of the children to the parents," the court found, "would place them at risk of abuse [and] neglect."

¶11        This court has jurisdiction over Mother and Father's timely appeals pursuant to Article 6, Section 9, of the Arizona Constitution, Arizona Revised Statutes ("A.R.S.") sections 8-235 (2015), 12-2101 (2015), and Rule 103 of the Arizona Rules of Procedure for the Juvenile Court.[2]

## DISCUSSION

### A.    Delay in the Adjudication.

¶12        The dependency proceedings in this case were extraordinarily long; nearly 22 months elapsed between the filing of the dependency petition and entry of the superior court's order after trial.  As the court noted at that time, "[a]djudication of dependency as to mother and father has been protracted due to extraordinary circumstances including the notice of a judicial officer, discovery issues, the unavailability of counsel and witnesses, and scheduling conflicts."

---

[2]        Absent material revision after the relevant date, we cite a statute's current version.

¶13 The delay is the basis of Mother's first argument, which is that the dependency should be dismissed because the adjudication was not made within 120 days, pursuant to A.R.S. § 8-842(C) (2015). That provision states:

> The court may continue the initial dependency hearing for good cause, but, unless the court has ordered in-home intervention, the dependency adjudication hearing shall be completed within ninety days after service of the dependency petition. The time limit for completing the dependency adjudication hearing may be extended for up to thirty days if the court finds good cause or in extraordinary cases as prescribed by the supreme court by rule.

¶14 In *Joshua J. v. Arizona Department of Economic Security*, 230 Ariz. 417 (App. 2012), this court held that a dependency adjudication made beyond the time limit specified in § 8-842(C) is not automatically void, and affirmed a dependency order made after the statutory time limit because the parent was not prejudiced by the delay. 230 Ariz. at 423, ¶ 20, 423-24, ¶¶ 22-26; *see also Ugalde v. Burke*, 204 Ariz. 455, 458, ¶ 12 (App. 2003) (construing similar language in statute governing timing of trial on petition to declare a sexually violent person).

¶15 Here, Mother waived application of § 8-842(C) by agreeing to the original six-month delay in trial scheduling. The parties knew the newly assigned judge's calendar was extremely crowded, and voluntarily "waive[d] time" to allow him to set the two half-days they told him they needed for trial for February 2014. Having agreed to the delay, Mother may not now argue the outcome of the trial must be undone because the delay prejudiced her. Mother argues she objected to further delay during a court appearance on February 18, 2014. But that was the occasion on which the court was forced to continue trial because Mother had failed to disclose her mental health records. Having withheld those records, Mother cannot complain of the resulting delay.

¶16 After the trial finally began in May 2014, the court heard testimony over five half-days during the ensuing four weeks. At that point, it became clear that the matter would require several more days of trial, but scheduling conflicts, family emergencies and an historic flood made it difficult to timely set the remaining trial days. We do not accept Mother's contention that DCS "delayed and expanded the trial" unnecessarily; as was their right, Mother and Father chose to vigorously contest the dependency allegations, but in doing so, they forced DCS to put on extensive evidence

to support its petition.  In any event, at no time after the trial began did Mother argue that A.R.S. § 8-842(C) applied to efforts by the parties, counsel and the court to identify additional trial dates that would accommodate their various schedules.

## B. Admission of the Son's Statements About the Gates.

¶17 Mother next argues the superior court erred by admitting second-hand accounts of the statements by the couple's son concerning how frequently and extensively Mother and Father used the baby gates for the twins.  We will not address this argument because Mother did not timely object to the statements in the superior court.  She did not object to admission of documents containing the accounts; nor did she object when DCS asked witnesses to recount the statements at trial.  Indeed, she did not object to the accounts of the boy's statements until a motion filed just before the last day of trial.  Because Mother did not object to the admission of the statements, she may not complain on appeal that the superior court erred by allowing them.  *See* Ariz. R. Evid. 103(a)(1); *Starkins v. Bateman*, 150 Ariz. 537, 544 (App. 1986).

## C. Sufficiency of the Evidence.

¶18 A dependent child is one who is "[i]n need of proper and effective parental care and control and who has no parent . . . willing to exercise or capable of exercising such care and control" or "whose home is unfit by reason of abuse, neglect, cruelty or depravity by a parent[.]"  A.R.S. § 8-201(14)(a)(i), (iii) (2015).  Neglect is defined as "[t]he inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare[.]"  A.R.S. § 8-201(24)(a) (2015).  The petitioner's burden of proof in a dependency proceeding is a preponderance of the evidence.  A.R.S. § 8-844(C)(1) (2015).

¶19 We review a superior court's order in a contested dependency hearing for an abuse of discretion and will disturb the adjudication only if no reasonable evidence supports it.  *See Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 234, ¶ 13, 235, ¶ 21 (App. 2005).  "On review of an adjudication of dependency, we view the evidence in the light most favorable to sustaining the [superior] court's findings."  *Id.* at 235, ¶ 21.  The superior court is "in the best position to weigh the evidence, judge the credibility of the parties, observe the parties, and make appropriate factual findings." *Pima County Dependency Action No. 93511*, 154 Ariz. 543, 546 (App. 1987).

¶20　　　　Both parents argue insufficient evidence supports the superior court's findings. Although the evidence was conflicting, the record contains sufficient evidence to support the findings of the court. For example, the parties vigorously contested whether the twins were kept behind the baby gates on a regular basis for extended periods, or, as Mother and Father asserted, only during nap times or when necessary for safety reasons. The court drew a reasonable inference from DCS witnesses who testified they observed the twins behind the gates on four occasions, and from another witness who said she often saw the girls behind the gates during the year preceding the 9-1-1 incident. The court heard evidence that the gates precluded the girls from exploring and having interaction with the rest of the family. Although Father argues the family physician testified the girls showed no signs of neglect, at the time they were taken into custody, the girls were experiencing a delay in speech development; there was some evidence they did not know their names, and they scored well below average on several developmental assessments. The parents argued they recognized the girls' speech issues and were taking steps to address those issues, but the superior court could conclude that Mother and Father had contributed to the girls' developmental delays and were neglecting them, or failing to protect them, by failing to remedy those delays.

¶21　　　　The court found the family home was "dirty, cluttered with unpleasant odor," and there was considerable evidence that when visitors arrived, they smelled the girls' soiled diapers. Although Mother argues clutter and unpleasant odor do not implicate a risk to a child's health and welfare, the court could conclude otherwise, particularly given the evidence that the twins were left in soiled diapers for extended periods of time.

¶22　　　　Mother argues DCS failed to investigate the true reason for her medical issues the day of the 9-1-1 call and asserts the agency violated her due-process rights by telling witnesses she overdosed that day. It was undisputed, however, that Mother suffered some medical event on the day in question that rendered her temporarily unable to care for her children. The precise cause of that event (and Mother offered evidence that she was suffering from low blood sugar, not a drug overdose) was immaterial to the court's findings. Mother argues DCS "poisoned the proceedings" by conveying false information about her medical condition to witnesses, but she was free to make that point, by way of cross-examination, whenever she thought that was happening. Although Mother argues her physician testified that her medical condition did not prevent her from parenting her children, as recounted above, a DCS worker testified that after Mother

returned from the emergency room she told the worker she was not able to care for her children.

¶23            Sufficient evidence also supports the court's finding that Mother and Father neglected their son's educational needs.  Mother first argues the court's finding about her son should be vacated because the dependency petition did not allege neglect of educational needs.  Based on the record, we conclude that the allegation that the parents neglected their son's education was tried by consent.  At no point did either parent object to evidence offered on that subject.

¶24            As to the substance of the court's findings with respect to the boy, by the time he was removed, he had missed 25 days of school since classes had begun the previous fall, and had been late 13 days.  Mother argues the boy missed so much school because he was frequently ill with allergies, but after he was placed in foster care, his absences slowed dramatically and he began to do well in school.  Although Mother contends she and Father were working with physicians to treat their son's allergies before he was removed, and that his allergies improved after he was removed due to medication that he began to take before he was removed, the matter was for the superior court to decide, based on the evidence before it.

## CONCLUSION

**¶25** For the reasons set forth above, the superior court did not err in finding the children dependent.[3]



**Ruth A. Willingham** · **Clerk of the Court**
F I L E D : ama

---

[3] We will not address Mother's argument, made for the first time in her reply brief, that the dependency order infringed her Fifth Amendment right against self-incrimination because it was premised on her refusal to admit that her medical condition prevented her from caring for her children or that use of the baby gates could constitute neglect. *See Ariz. Dep't of Revenue v. Ormond Builders, Inc.*, 216 Ariz. 379, 385, ¶ 24, n.7 (App. 2007).