NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

RODNEY L., DEANA L., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, J.L., *Appellees.*

No. 1 CA-JV 19-0087
FILED 2-27-2020

Appeal from the Superior Court in Mohave County
No. L8015JD201707004
The Honorable Douglas Camacho, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Harris & Winger PC, Flagstaff
By Chad J. Winger
*Counsel for Appellant, Mother*

Law Offices of Harriette P. Levitt, Tucson
By Harriette P. Levitt
*Counsel for Appellant, Father*

Arizona Attorney General's Office, Phoenix
By Lauren J. Lowe
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Michael J. Brown and Judge Lawrence F. Winthrop joined.

---

**C A M P B E L L**, Judge:

¶1        Rodney L. ("Father") and Deana L. ("Mother") appeal the superior court's order terminating their parental rights to their son, J.L. Father argues the Department of Child Safety ("DCS") provided insufficient evidence to support the statutory ground of fifteen months time in care, that his participation in services should overcome the grounds for termination, and that termination would not be in the best interests of the child. Both parents argue DCS failed to make diligent efforts to provide appropriate reunification services. Here, sufficient evidence supports the superior court's findings.  We affirm.

**BACKGROUND**

¶2        Father and Mother have one child together, a boy born in 2015. Father has an extensive history of domestic violence with his intimate partners prior to and including his relationship with Mother.  DCS got involved in late-December 2016 after a physical altercation in the child's presence and left Mother with severe bruising and swelling on her face. Father reportedly punched Mother in the face, and she responded by kicking Father in the groin.  Father recorded the fight with his cell phone, and when Mother tried to take the phone from Father, he threw it at her face.  Mother ran from the house screaming for neighbors to call 911. Both parents were arrested.

¶3        At an investigatory interview, both parents downplayed the severity of the fight, blaming it on stress. However, once Father left the interview, Mother admitted to another domestic violence incident from the year prior.  DCS helped Mother and the child move out of the home.

¶4        Shortly thereafter, Mother disclosed that there were over two years of physical and emotional domestic violence by Father, going back as far as to when she was pregnant with the child, and Father pushed Mother down the stairs.  She disclosed another instance where Father choked her until she passed out, reportedly telling her to "just go with it." Mother's

2

doctors believe this loss of oxygen to her brain may have caused Mother's memory issues. Mother also suffers from obsessive compulsive disorder and depression, and Father would not let her take medication for either condition.

¶5        DCS warned Mother that because of the extensive history of domestic violence and abuse, and the risks it posed for the boy, DCS would take custody of the child if she returned to Father. The next month, Mother obtained an order of protection against Father, filed for divorce, and filed for emergency temporary custody of the child. However, a few days after filing, Mother dropped the order of protection and returned to live with Father.

¶6        Within the next month, Mother and Father engaged in another altercation, resulting in Mother's arrest for domestic violence and criminal damage. Reportedly, Father wanted Mother to meet him at home to provide him a copy of the dropped order. Mother went to the home to do so but changed her mind, which lead to an altercation. After Mother got out of jail, she got a second order of protection against Father.

¶7        As warned, DCS took custody of the child in January 2017 and filed a dependency petition alleging the child to be dependent regarding both Mother and Father. DCS asserted Mother failed to treat her mental health, Father neglected the child due to substance abuse, and that both parents exposed the child to significant acts of domestic violence. In March of 2017, the superior court found the child dependent regarding both parents.

¶8        DCS referred both parents for services including drug testing, psychological evaluations, individual counseling, domestic violence counseling, and supervised visitation. DCS also referred Father for substance abuse treatment.

¶9        Mother and Father both completed psychological evaluations with Dr. Stephen Gill. Dr. Gill gave each parent a guarded prognosis regarding their ability to safely parent the child in the future, citing "serious concern" for parents' violent history. Dr. Gill recommended Mother continue with mental health treatment, but specifically discouraged couples' therapy "due to the severity" of parents' domestic violence. Dr. Gill conditioned Father's ability to safely parent the child "on his ability to demonstrate that he is not a candidate to engage in or return to his violent behaviors with" Mother, and recommended that Father meet weekly with

a therapist who has an extensive background in substance abuse and domestic violence recovery.

¶10　　　　In July 2017, Father completed a bonding and best interests assessment with Dr. Kathryn Menendez. Dr. Menendez noted that Father downplayed the potential risks that witnessing domestic violence could cause to the child's health and instead focused heavily on Mother's mental health. Dr. Menendez concluded that although Father and the child have a good bond, Father "fails to accept full responsibility for his domestic violence issues and his problematic relationship with" Mother, "fails to acknowledge the emotional and physical threat to the children" from his aggression, and "minimizes his past history, heavily emphasizing his wife's limitations." Dr. Menendez also noted a potential increase in "stressors" which may cause Father's "propensity to violence [to] increase" as he and the child grow older. Because of Father's likelihood of continued aggression, Dr. Menendez concluded "[t]his would be a high-risk reunification."

¶11　　　　While both parents participated in services, both failed to make the behavioral changes necessary to safely parent the child, and instead remained in their combative relationship until they divorced in December 2018. Moreover, against professional recommendations, parents began couples counseling through their church, and Father moved to have all services provided jointly.

¶12　　　　In October 2017, the superior court denied Father's motion for joint services and changed the case plan from family reunification to severance and adoption. DCS then moved to terminate Mother and Father's parental rights, alleging the statutory grounds of neglect and nine months time in care. In May 2018, DCS amended its motion to add the statutory ground of fifteen months time in care.

¶13　　　　The court held a joint contested hearing in the summer of 2018 but the hearing resulted in a mistrial once the court granted a request to bifurcate Mother and Father's termination hearings. The court then held a contested termination for Father in February 2019 and, separately, for Mother in March 2019. The court terminated both parents' rights to the child.

**DISCUSSION**

## I.     Termination Ground

¶14     To terminate a parent-child relationship, the superior court must find at least one statutory ground for severance under A.R.S. § 8-533(B) by clear and convincing evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). The court must also find severance is in the child's best interests by a preponderance of the evidence. *Id.*

¶15     We review the court's severance determination for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).   The superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of the witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004).

¶16     The superior court may terminate parental rights under the fifteen month out-of-home placement ground if it finds that (1) "[t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer"; (2) "the parent has been unable to remedy the circumstances" causing the out-of-home placement; and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c).[1]

¶17     The superior court must also find that DCS made diligent efforts to provide appropriate reunification services. A.R.S. § 8-533(B)(8). DCS makes diligent efforts to provide appropriate reunification services when it provides a parent with the "time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 94, ¶ 20 (App. 2009).  DCS "is not required to provide every conceivable service or to ensure that a parent participates in each service it offers."  *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).

### A.     Father

¶18     Father argues no reasonable evidence supports the fifteen month time in care ground for terminating his parental rights by

---

[1]     Absent material changes from the relevant date, we cite the current version of rules and statutes.

challenging the credibility of Mother and his ex-wife regarding other acts of domestic violence and points to a single arrest of domestic violence as support for this claim. Father asserts that even if DCS painted him as controlling and manipulative, this was not grounds for termination. Father also argues that termination was improper because he participated in services. Lastly, Father argues that DCS failed to make diligent efforts to provide appropriate rehabilitation services.

¶19 Father's first argument is not substantiated by the record. Upon due consideration of the evidence and testimony, the superior court specifically found that Father had a significant history of committing acts of domestic violence which dated back as early as 2002. This finding is supported by testimony from Mother that Father would engage in "violent episodes" "sometimes daily, sometimes weekly."

¶20 We will not reweigh evidence, but rather we view all evidence and reasonable inferences therefrom in the light most favorable to affirming the superior court's order. *Jordan C.*, 223 Ariz. at 93, ¶ 18.

¶21 Mother disclosed numerous examples of Father's violence to DCS. During her pregnancy, Father would choke her until she felt like she was going to lose consciousness and punch her in the stomach. Mother testified that her obstetrician told her she "start[ed] to have a miscarriage." The physical abuse continued after the child was born. Mother testified that Father choked her painfully, beat her with a stick on the bony parts of her body, dragged her across gravel, pushed her down the stairs, and punched her in the head and body while she was holding the child.

¶22 Father would psychologically abuse Mother as well, which aligned with DCS's evidence that Father was controlling and manipulative. Father refused to allow Mother to take medication for her OCD, which impaired her self-esteem, anxiety and, "ability to function." When Father would respond violently to Mother's anxious and obsessive behavior, he would blame Mother, making her believe that "if [she] didn't poke the bear then [she] wouldn't have been abused." Father would berate Mother for having mental illnesses, call her crazy, and tell her she deserved to burn in hell.

¶23 At least two times Father threatened to kill Mother. On another occasion, Father threatened to push Mother out a window while she was holding the child so they both would "fall to the ground." Father referred to the child as Mother's "human shield." In fact, the child was

either present, nearby, or in Mother's arms for many domestic violence incidents.

¶24 Father also tried to control Mother. There were times he refused to let Mother see her own family and certain friends. Mother disclosed that on multiple occasions, Father told her "if she didn't lie [in court], he would make her out to be crazy."

¶25 Father's abuse "got progressively worse" over time. Mother reported that "the verbal abuse became so bad that [she told Father] to just kill her because she couldn't take it anymore." Father continued his controlling abusive behavior with Mother throughout the relationship, up until the parents divorced in December 2018, only two months before the termination hearing.

¶26 Accordingly, while Father's argument centers primarily on his single arrest for domestic violence giving rise to DCS's involvement in December of 2016, reasonable evidence in the record supports the superior court's finding that Father engaged in multiple acts of domestic violence.

¶27 Father also argues against termination by asserting that he participated in services. It is true Father participated in services, except that he did not obtain proper counseling until after August 2018. Based on Dr. Gill's recommendation, DCS required him to engage in individual counseling with a licensed therapist who had significant training in domestic violence and substance abuse. The case manager discussed this requisite with Father, but he insisted on seeing his own counselors who did not meet the professional requirements.

¶28 The court expressly acknowledged that Father participated in other services. However, as DCS noted, "engagement is not the same as a behavioral change." The court found that although Father "completed classes and counseling, he has no insight into his domestic violence." The DCS case manager testified that, even after the first trial, Father believed he did "not need to make behavior changes." Instead, Father said that "all of the allegations made by [DCS] are false or based on lies." Father continually blamed others for the situation including Mother and her parents for lying to DCS, Mother's attorney for "inventing a smear campaign against him," and DCS for being "corrupt."

¶29 Father also claimed that Mother and her mental illness are the reasons why the child was removed. The case manager testified that "even when [Father] does take responsibility, it is with stipulations, . . . meaning he admits to violence but then sees that violence as acceptable because it's

in response to [Mother] or [that] she's crazy so [Father] had no choice but to act with violence . . . ."

¶30        The court also referenced Father's history of domestic violence in his prior relationships, dating back to 2002. From 2002 to 2011, DCS received numerous reports of violence between Father and his ex-wife. In these reports, Father's ex-wife and older children disclosed that Father was abusive and that they were afraid of him. Evidence at trial showed Father engaged in a pattern of domestic violence spanning at least 16 years and had engaged in domestic violence counseling on multiple occasions, with no positive change noted.

¶31        The case manager concluded that Father's actions "show[] a lack of insight, a lack of personal judgment, and ultimately a failure to accept responsibility." This testimony is consistent with that of other professionals overseeing the case. Father's counselor at Interagency noted that while Father "shows resp[onsibility] for his actions," he "downplay[s] it." Dr. Gill testified that Father acknowledged the December 2016 charges of domestic violence, but "did not admit that he was engaged in domestic violence and instead felt that he was being victimized by [Mother] and her family." Dr. Menendez concurred that Father blamed others and generally downplayed the domestic violence. The case manager and Dr. Gill also testified about how witnessing domestic violence is extremely harmful to children. DCS further explained that the child is "extremely vulnerable due to his age," and that because of parents' "erratic and unpredictable" behavior, "neither parent is able to provide the child with a safe home free from abuse or neglect."

¶32        On this evidence, the court found Father has been unable to remedy the circumstances that cause the child to be in an out-of-home placement, and that there is a substantial likelihood Father will not be capable of exercising proper and effective parental care and control in the near future.

¶33        Father next argues termination was improper because DCS failed to make diligent efforts to provide appropriate reunification services by failing to increase visitation with the child, failing to formulate a transition plan, and failing to direct him to an appropriate therapist.[2]

_____

[2]        In his reply brief, Father cites more services that he claims DCS should have provided. Because he did not raise these in his opening brief,

¶34 First, Father fails to develop his argument or cite to the record in support of his claim that visitation "was supposed to be six hours per week but was never more than four hours per week." *See* ARCAP 13(a)(7) (requiring an "argument" contain the appellant's "contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies"). He also did not raise this concern with the superior court. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179 (App. 2014) ("A parent who does not object [to the adequacy of services] in the juvenile court is precluded from challenging that finding on appeal."). When Father did raise a visitation issue to the superior court, he limited his argument to specific missed visits between April and August 2017. The court held an evidentiary hearing and ruled on the issue. Finally, contrary to Father's argument, records show he was in fact receiving over four hours of supervised visitation each week.

¶35 Next, Father contends DCS should have created a plan to transition the child back into his custody because he was participating in services. Father's argument ignores the fact that he was still engaging in a violent relationship with Mother for most of the dependency and, as discussed above, failed to make the requisite behavioral changes in order to be able to safely parent the child. This is consistent with the court's findings and we will not reweigh the evidence on appeal. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 (App. 2002).

¶36 Finally, Father's argument relies on DCS's alleged failure to direct him to an appropriate counselor. Foremost, DCS "is not required to provide every conceivable service." *Maricopa Cty. Juv. Action No-JS-501094*, 180 Ariz. 348, 353 (App. 1994). Besides, the record shows DCS provided Father with individual counseling with an approved licensed counselor to address domestic violence treatment, and Father participated in this service. However, DCS explained he would need to find a licensed counselor specializing in substance abuse treatment in addition to the domestic violence counseling. Per this record, Father never sought a substance abuse counseling referral from DCS. Instead, Father arranged for counseling on his own through his church pastor.

---

we do not address them. *See Ariz. Dep't of Revenue v. Ormond Builders, Inc.*, 216 Ariz. 379, 385 (App. 2007).

¶37 Reasonable evidence supports the fifteen month time in care ground for terminating his parental rights and that DCS made diligent efforts to provide appropriate rehabilitation services.

## B. Mother

¶38 Mother argues termination pursuant to the statutory ground of fifteen months time in care is not appropriate because DCS failed to make diligent efforts to provide adequate rehabilitation services. Mother names three specific services DCS allegedly failed to provide: a psychiatric assessment, boundary-setting treatment, and a follow-up psychological evaluation. Mother also argues that DCS failed to adequately develop a case plan for Mother after August of 2017 by failing to consider her status as a domestic violence victim.

¶39 For purposes of this appeal, Mother has waived any issues with respect to inadequate provision of mental health or domestic violence services because Mother did not raise these issues in the superior court at the dependency hearing nor at the termination hearing, and we generally do not consider any issue on appeal that was not raised below. *See Shawanee S.*, 234 Ariz. at 178–79, ¶ 16.

¶40 Even if Mother had not waived the issue, the record shows she was provided with all but one of the services she claims were not provided. Mother received mental health services through her own providers throughout the dependency, and those mental health providers offered psychiatric services. Mother also received training on setting healthy boundaries through Southwest Behavioral & Health Services. Additionally, Mother was provided with domestic violence victims' counseling through Interagency and again later through Southwest Behavioral & Health Services.

¶41 The only service Dr. Gill recommended that DCS did not provide to Mother was a follow-up psychological evaluation. However, the purpose of a follow-up evaluation would have been to "determine her level of treatment progress," and was contingent on the case manager's agreement that it was necessary to do so. Thus, such service was not required, but rather solely within the agency's discretion. Dr. Gill testified there were no other services that DCS could have provided Mother that would have resolved her domestic violence issues. Accordingly, reasonable evidence supports the court's finding that DCS made diligent efforts to provide appropriate reunification services.

## II.    Best Interests

¶42    Father argues that DCS presented insufficient evidence to support the court's best interests finding.  We disagree.

¶43    In considering whether termination of parental rights is appropriate, the superior court must find termination is in the Children's best interests by a preponderance of the evidence.  *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149–50, ¶ 8 (2018). Termination of parental rights is in the children's best interests if termination would benefit the children or if continuation of the relationship would harm the children.  *Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 572, ¶ 9 (App. 2018) (internal citation omitted).

¶44    Once the court's focus shifts to the best interests analysis, the "foremost concern is protecting a child's interest in stability and security." *Id.* (internal quotations omitted). The superior court also considers whether the current placement is meeting the child's needs and whether the placement wants to adopt the child.  *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998) (internal citations omitted). "The existence and effect of a bonded relationship between a biological parent and a child, although a factor to consider, is not dispositive in addressing best interests." *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98–99, ¶ 12 (App. 2016).

¶45    Here, reasonable evidence supports the court's determination that termination would be in the child's best interests because continuation of the relationship would be harmful to the child. Father never gained insight into or took responsibility for his role in a 16-year pattern of domestic violence, leaving him susceptible to repeating the cycle. Not once during the dependency did Father acknowledge the harm that domestic violence has on the child.  Father never acknowledged how he jeopardized the child's health and wellbeing by making him a witness to his parents' discord and violence. The court heard testimony that witnessing domestic violence can have a negative impact on a child's brain development, including increased susceptibility to mental health issues, substance abuse, and future violent relationships.  The court also heard evidence that termination of Father's rights would benefit the child. The child is in a family placement where his needs are being met, and he is thriving in their care.  The home is free of violence and neglect and would provide the child permanency and stability because the family is loving and wishes to adopt the child.  In light of the evidence presented, the court did not abuse its discretion in finding that termination was in the child's best interests.

### III. Ineffective Assistance of Counsel

¶46　　　　Father argues the superior court erred in finding that he failed to establish his ineffective assistance of counsel claim. Father and DCS suggest that Arizona courts have recognized that the law permits relief for ineffective assistance of counsel in a proceeding to terminate parental rights.

¶47　　　　However, Arizona case law appears to leave open the question of whether we have expressly adopted ineffective assistance of counsel claims in the context of dependency or severance proceedings, and we have not articulated any particular standard for what those claims would require. *See, e.g.*, *John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 322–25, ¶¶ 8–17 (App. 2007) (summarizing arguments for and against recognizing ineffective assistance of counsel as constitutional grounds for reversible error in a severance case but ultimately declining to resolve the issue). Here, even if Arizona were to recognize an ineffective assistance of counsel claim in dependency proceedings, Father's appeal is untimely, and we lack jurisdiction to consider it. Ariz. R.P. Juv. Ct. 104(A) ("A notice of appeal shall be filed with the clerk of the superior court no later than 15 days after the final order is filed with the clerk."); *Pima Cty. Juv. Action No. S-933*, 135 Ariz. 278, 279 (1982) ("The failure to file an appeal in a timely fashion deprives the appellate court of jurisdiction.").

¶48　　　　The superior court heard evidence regarding Father's ineffective assistance of counsel claim during the initial joint termination hearing. At Father's own insistence, the court issued a ruling on October 26, 2018, determining that Father failed to establish that he was provided ineffective assistance of counsel. Father did not appeal that order.

¶49　　　　Because Father did not file an appeal to that order, we do not have jurisdiction to consider the issue. The issue has been waived.

**CONCLUSION**

¶50        For the foregoing reasons, we affirm.[3]



AMY M. WOOD • Clerk of the Court
FILED:  AA

---

[3]        Because we affirm the termination order under the fifteen month out-of-home placement ground, we need not consider the parents' arguments regarding the remaining grounds. *Jesus M.*, 203 Ariz. at 280, ¶ 3.