91 P.3d 1002

**J.L.F., a single woman, Plaintiff–Appellant,**

v.

**ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM, an Arizona State Agency; Mercy Healthcare Group, an Arizona corporation, Defendants–Appellees.**

No. 1 CA–CV 03–0627.

Court of Appeals of Arizona, Division 1, Department D.

June 8, 2004.

Reconsideration Denied July 30, 2004.

**160**

Arnett & Arnett, P.C., by Wayne C. Arnett, Tempe, Attorneys for Plaintiff–Appellant.

Johnston Law Offices, P.L.C., by Logan T. Johnston, III, Phoenix, Attorney for Defendant–Appellee Arizona Health Care Cost Containment System.

Isaacson & Duffy, P.C., by Steven J. Duffy, Phoenix, Attorneys for Defendant–Appellee Mercy Healthcare Group.

## OPINION

EHRLICH, Judge.

¶ 1 J.L.F.[1] appeals from the judgment affirming a decision of the Director of the Arizona Health Care Cost Containment System ("AHCCCS") to deny her insurance coverage for a breast-reconstruction procedure. For reasons discussed below, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 J.L.F. is an insured of Mercy Healthcare Group, an AHCCCS-administered private employer group health plan. *See* Ariz. Rev.Stat. ("A.R.S.") § 36–2912 (2003). Because of cancer, she underwent a bilateral mastectomy and bilateral breast reconstructive surgery. Dr. Shaun Parsons performed the reconstructive surgery. That procedure was unsuccessful, and Dr. Parsons performed another reconstructive surgery, including an implant exchange.

¶ 3 After the second reconstructive procedure, J.L.F. complained that her breasts were asymmetrical, specifically that her left breast was "flatter and smaller" than the right one. Dr. Parsons recommended against additional surgery. He wrote in his progress notes that J.L.F. has "fairly symmetric breasts" and that, although the left side is "slightly smaller than the right," there is "maybe about half a centimeter difference between the two sides."

> It's so subtle, that I don't think it's worth the risk of going back in, re-operating, and risking infection and loss of the implant. I understand that it is probably only a 3 to 5% risk, but it is still a risk, and I can't imagine losing that much ground for such a little bit of difference between the two sides. And also, I can't promise that I can make them exactly symmetric. I told [J.L.F.] that I would not operate, that she has to have realistic expectations. I can't promise that I can make them exactly symmetric. I never have done that.

¶ 4 J.L.F. obtained a second opinion from Dr. Steven Gitt, who requested authorization from Mercy Healthcare for a second implant exchange. In his request, though, Dr. Gitt acknowledged that J.L.F.'s breasts showed only a "slight asymmetry" and that her appearance would be improved only "slightly by increasing the left-sided fill."

¶ 5 Mercy Healthcare denied coverage on the basis "that surgery to correct mild mammary asymmetry appears to be for cosmetic reasons" and therefore excluded by the Group Services Agreement. Dr. Angelo Demis, Mercy Healthcare's Associate Medical Director, later testified at the AHCCCS hearing that, in speaking with Dr. Gitt, Dr. Gitt had not only echoed Dr. Parsons' concerns but added that he would not be "that upset" if Mercy Healthcare denied authorization for the surgery because he was "not really sure that [he could] satisfy [J.L.F.'s] request to make [the breasts] absolutely symmetrical."

¶ 6 J.L.F. filed a grievance with Mercy Healthcare, challenging the denial of her requested surgery. She relied upon the federal Women's Health and Cancer Rights Act of 1998 ("Act"), 29 U.S.C. § 1185b (Supp.2003), which provides that an individual receiving benefits for a medically necessary mastectomy who elects breast reconstruction will also receive coverage for "surgery and recon-

---

1. The initials of the plaintiff are being used to    protect her privacy.

struction of the other breast to produce a symmetrical appearance." Mercy Health-care upheld its denial of coverage on the basis that the surgery was cosmetic.

¶7 J.L.F. appealed that decision and requested an AHCCCS hearing. A hearing was held, and the administrative law judge ("ALJ") issued a Recommended Decision that the AHCCCS Director grant J.L.F.'s grievance appeal because there was a "readily-discernable difference in [the] size and shape of [J.L.F.'s] breasts."

¶8 The AHCCCS Director[2] denied the grievance appeal. She ruled that the Act did not require the requested third surgery.

The average human body in its normal state is not perfectly symmetrical. The issue in this case therefore necessarily involves the degree of asymmetry. As stated, two doctors who have examined [J.L.F.] determined that the asymmetry was subtle and slight. Even Dr. Gitt ... indicated that any improvement as a result of the surgery would be slight. Furthermore, [Dr. Demis] concluded that further reconstructive surgeries were not warranted because very good results have been achieved through the prior surgeries. The opinion of these three doctors confirm the requirements of [the federal and state laws] have been met. Further surgery will not provide exactly symmetrical breasts and the most that can be hoped for is a slight improvement in symmetry. Neither [the federal law nor the state law] require[s] continuing surgery to attempt to obtain exact symmetry based on the subjective desires of the member.[3]

¶9 J.L.F. sought judicial review of the AHCCCS decision. The superior court concluded that the Director's decision was supported by substantial evidence and that the Director had acted within her discretion in determining that J.L.F.'s breasts had a symmetrical appearance. J.L.F. appealed, presenting the following issues:

1. The appropriate standards of review for this court, the superior court and the AHCCCS Director given the factual determinations of the ALJ;

2. Whether the superior court erred in giving deference to the Director as opposed to the ALJ who saw J.L.F. and her witnesses; and

3. Whether the decision of the Director was supported by substantial evidence.

### DISCUSSION

¶10 In examining the judgment of the superior court on its review of an administrative decision, we determine whether the order is supported by the law and substantial evidence, and whether it is arbitrary, capricious or an abuse of the agency's discretion. *Sanderson Lincoln Mercury, Inc. v. Ford Motor Co.*, 205 Ariz. 202, 205 ¶8, 68 P.3d 428, 431 (App.2003) (citing A.R.S. § 12–910(E)). While we consider the agency's interpretation of the statutes it administers, we review the law de novo. *Id.*

¶11 J.L.F. argues that the superior court gave undue deference to the Director's decision over that of the ALJ when it was the ALJ and not the Director who saw her at the hearing and, thus, was the better judge of the evidence. This contention would be significant if the facts were in dispute or if the resolution of this case hinged on the credibility of the witnesses. *See Sigmen v. Ariz. Dept. of Real Estate*, 169 Ariz. 383, 385–86, 819 P.2d 969, 971–72 (App.1991). The ALJ relied not on J.L.F.'s actual physical appearance, however, but on photographic evidence in concluding that there was a "readily-discernible difference in size and shape" of J.L.F.'s breasts. The Director similarly made her decision "in consideration of the record," which included the same evidence relied upon by the ALJ.

¶12 Additionally, the decision of the Director is the final administrative decision.

2. The Director acted through her designee, the Administrative Hearing Decision Administrator, but it is the Director to whom we will refer.

3. The ALJ ruled that the Act preempts the Group Service Agreement's and Arizona Administrative Code's exclusions of cosmetic services. The Director struck that portion of the ALJ's decision. The superior court ruled as had the ALJ, and its conclusion is not contested.

162

It is she who "may review the [ALJ's] decision and accept, reject or modify it." A.R.S. § 41–1092.08(B) (2004). If the Director does modify it, she must provide "a written justification setting forth the reasons for the rejection or modification." *Id.* The decision of the agency director is the final administrative decision. A.R.S. § 41–1092.08(F). Thus, we consider whether the Director's decision was lawful and supported by substantial evidence, not the decision of the ALJ. *See Smith v. Ariz. Long Term Care Sys.,* 207 Ariz. 217, 220 ¶ 15, 84 P.3d 482, 485 (App.2004).

■ ¶ 13 The Act upon which J.L.F. relies states:

A group health plan ... that provides medical and surgical benefits with respect to a mastectomy shall provide, in a case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for—

\* \* \*

2) surgery and reconstruction of the other breast to produce a symmetrical appearance ...

\* \* \*

in a manner determined in consultation with the attending physician and the patient.

29 U.S.C. § 1185b.

¶ 14 The statute does not provide a definition of symmetrical appearance or, indeed, any measure or guidance to determine whether a symmetrical appearance has been achieved. J.L.F. insists that her breasts do not have a symmetrical appearance, and she argues that the Act implies that deference should be given her and her treating physician to decide if a symmetrical appearance has been achieved and how to proceed if it has not been attained.

■ ¶ 15 When interpreting statutory language, "we seek a sensible construction" and construe the words in their "natural, obvious, and ordinary meaning." *Simpson v. Owens,* 207 Ariz. 261 ¶ 33, 85 P.3d 478, 489 (App.2004) (citations omitted); *see also* A.R.S. §§ 1–211, –213 (2002). If the legislative intent is not clear from the words of the

statute itself, we consider "the statute's context, subject matter, historical context, effects and consequences, and spirit and purpose," *Sanderson Lincoln Mercury,* 205 Ariz. at 205 ¶ 11, 68 P.3d at 431, and its legislative history. *Hayes v. Cont'l Ins. Co.,* 178 Ariz. 264, 269, 872 P.2d 668, 673 (1994). The legislative history shows that the Act had four primary purposes:

1. To require insurers to provide coverage for the hospital length of stay determined by the physician to be medically necessary;

2. To require health insurers to provide coverage for breast reconstruction following a mastectomy;

3. To require insurers to provide coverage for breast prostheses and complications of mastectomy, including lymphodemas; and

4. To prohibit insurers from financially penalizing physicians for providing medically necessary care or for referring a patient for a second opinion.

144 Cong. Rec. S4647 (daily ed. May 12, 1998) (statement of Sen. Feinstein). Although as introduced, the provision regarding the length of hospital stay and the provision regarding breast reconstruction following a mastectomy both contained a modifying clause similar to "in a manner determined in consultation with the attending physician and the patient," *See* 144 Cong. Rec. S8505–08 (daily ed. July 17, 1998); 144 Cong. Rec. S2340–43 (daily ed. Mar. 19, 1998); 144 Cong. Rec. S2225–28 (daily ed. Mar. 18, 1998); 143 Cong. Rec. S4124–26 (daily ed. May 7, 1997); 143 Cong. Rec. S4031–33 (daily ed. May 7, 1997); 143 Cong. Rec. S886–90 (daily ed. Jan. 30, 1997), the necessity of consultation was only emphasized with regard to the first purpose of the Act and not to the second purpose. The first concern was to ban "drive-through mastectomies," 144 Cong. Rec. S4649–50 (daily ed. May 12, 1998) (statement of Sen. Murkowski), by requiring the health insurer to allow the patient to receive in-patient treatment as long as the physician deemed necessary in consultation with the patient. *See* 144

Cong. Rec. S4646–48 (daily ed. May 12, 1998) (statement of Sen. Feinstein).[4] The second concern was to bar health insurers from categorizing reconstructive surgery following a mastectomy as cosmetic and denying coverage, *see* 144 Cong. Rec. S4646–48 (daily ed. May 12, 1998) (statement of Sen. Feinstein), without thought of the well-being of the patient.[5]

¶ 16 The spirit and purpose of the Act was to provide a woman with insurance coverage for reconstructive surgery "to produce a symmetrical appearance" of her breasts following a mastectomy with the "manner" of the procedure "determined in consultation with the treating physician and the patient." This does not equate to the unrestricted provision of coverage for a subjective, autonomous decision by the patient without objective support.

¶ 17 J.L.F. is entitled to insurance coverage for post-mastectomy reconstructive surgery to achieve a symmetrical appearance of her breasts if her wish to undergo the procedure is supported by sufficient competent evidence, but the record supports the Director's Decision that J.L.F.'s breasts are within the range of normal human form and symmetry. Dr. Parsons wrote that J.L.F.'s breasts are "fairly symmetric" with "maybe about half a centimeter difference between the two sides,"[6] and he recommended against further surgery because the possibility of the achievement of greater symmetry was not worth the risk of additional surgery. Although Dr. Gitt sought approval for another surgery, he also acknowledged that J.L.F.'s breasts showed only a "slight asymmetry" and that the appearance would be improved only "slightly by increasing the left-sided fill." Dr. Demis stated that not only had Dr. Gitt echoed Dr. Parsons' concerns but that Dr. Gitt was "not really sure that [he could] satisfy [J.L.F.'s] request to

**4.** *See also* 144 Cong. Rec. S4876 (daily ed. May 14, 1998) (statement of Sen. Feinstein); 144 Cong. Rec. S4875–76 (daily ed. May 14, 1998) (statement of Sen. D'Amato); 144 Cong. Rec. S4648–49 (daily ed. May 12, 1998) (statement of Sen. Snowe); 144 Cong. Rec. S3008–09 (daily ed. Apr. 1, 1998) (statement of Sen. Murkowski); 143 Cong. Rec. E2103 (daily ed. Oct. 28, 1997) (statement of Rep. Kelly); 143 Cong. Rec. S5884–85 (daily ed. June 17, 1997) (statement of Sen. Dodd); 143 Cong. Rec. H1962–63 (daily ed. Apr. 29, 1997) (statement of Rep. Kelly); 143 Cong. Rec. E170 (daily ed. Feb. 5, 1997) (statement of Rep. Kelly); 143 Cong. Rec. E159 (daily ed. Feb. 5, 1997) (statement of Rep. Molinari); 143 Cong. Rec. S884–86 (daily ed. Jan. 30, 1997) (statement of Sen. D'Amato); 143 Cong. Rec. S42 (daily ed. Jan. 29, 1997) (statement of Sen. Snowe).

**5.** *See also* 144 Cong. Rec. S12825–26 (daily ed. Oct. 21, 1998) (statement of Sen. D'Amato); 144 Cong. Rec. S4875–76 (daily ed. May 14, 1998) (statement of Sen. D'Amato); 144 Cong. Rec. S4650 (daily ed. May 12, 1998) (statement of Sen. Faircloth) (emphasizing a woman's "right to have a complete reconstruction of her breast to restore her body and sense of self-esteem"); 144 Cong. Rec. S4648–49 (daily ed. May 12, 1998) (statement of Sen. Snowe); 144 Cong. Rec. S3009 (daily ed. Apr. 1, 1998) (statement of Sen. Murkowski) ("Women who are unable to receive reconstructive surgery, suffer from depression, a sense of loss, and need more cancer survivor counseling.... Additionally reconstructive surgery can be preventative medicine—women who don't have reconstructive surgery often develop other medical problems or complications with their spine." (quoting Dr. Sarah Troxel of Providence Hospital)); 143 Cong. Rec. E2103 (daily ed. Oct. 28, 1997) (statement of Rep. Kelly) (emphasizing the bill "is a patient's bill aimed at providing patients, in consultation with their physicians, a greater degree of autonomy when deciding appropriate medical care and, therefore, taking back control of their lives"); 143 Cong. Rec. S5884–85 (daily ed. June 17, 1997) (statement of Sen. Dodd); 143 Cong. Rec. H1963 (daily ed. Apr. 29, 1997) (statement of Rep. Kelly); 143 Cong. Rec. E170–71 (daily ed. Feb. 5, 1997) (statement of Rep. Kelly) (in discussing the need for insurers to cover reconstructive surgery, "[w]e must understand that self-image is at stake at a time when optimism and inner strength can be the difference between life and death"); 143 Cong. Rec. E159 (daily ed. Feb. 5, 1997) (statement of Rep. Molinari); 143 Cong. Rec. S884–86 (daily ed. Jan. 30, 1997) (statement of Sen. D'Amato); 143 Cong. Rec. S42 (daily ed. Jan. 29, 1997) (statement of Sen. Snowe) ("availability of reconstructive surgery is important not only for those women who believe it is necessary to return their lives to normal following cancer surgery, but because studies show that the fear of losing a breast is a leading reason why women do not participate in early breast cancer detection programs").

**6.** J.L.F. asserts that this last note contained a transcription error. She failed to avail herself of any opportunity to have Dr. Parsons correct his notes, but, even so, the tenor of his notes are that any difference between the appearance of the two breasts is negligible.

make [the breasts] absolutely symmetrical."[7]

¶ 18 Dr. Demis added that further surgery would be authorized as appropriate if there was an objective asymmetry, or if there was an underlying medical basis, such as infection. He explained that, when there is a request for additional reconstructive breast surgery because of asymmetry,

> what we would usually do on that, in that instance is then definitely ask for the surgeons to corroborate the evidence with the photographs, and it would help make a decision. And in this instance we didn't ask for photographs initially because we were so impressed with Dr. Parsons' note saying that [J.L.F.] was probably being somewhat unrealistic in terms of what her ultimate result[s] were and could be in the future despite repeated attempts to improve upon.

While Dr. Demis opined that further reconstructive surgery for J.L.F. was unwarranted because very good results already had been achieved from the prior surgeries, Mercy Healthcare also agreed that it would not object if J.L.F. sought a third opinion at its expense, perhaps an opinion from a plastic surgeon.

¶ 19 The Director relied upon these medical opinions (and her designee on his own expertise) to conclude that the requirements of the Act had been met because J.L.F. had received the mandated reconstructive surgery with "very good" results albeit not to the satisfaction of J.L.F. The Director further noted that the two physicians who had examined J.L.F. had "determined that the asymmetry was subtle and slight." Based upon the opinions of the two treating physicians and Mercy Healthcare's Associate Medical Director, the Director concluded that "[f]urther surgery [would] not provide exactly symmetrical breasts and the most that can be hoped for is a slight improvement in

symmetry," a result not mandated by the Act.

### CONCLUSION

¶ 20 We affirm the judgment affirming the Director's decision.

CONCURRING: DONN KESSLER, Presiding Judge and PHILIP HALL, Judge.

---

7. In her reply brief, J.L.F. contends that this statement is hearsay and should not have been considered by AHCCCS or the superior court. First, an issue raised for the first time in the reply brief will be disregarded. Ariz. R. Civ.App. P. 13(c); *Wasserman v. Low*, 143 Ariz. 4, 9 n. 4, 691 P.2d 716, 721 n. 4 (App.1984). Second, J.L.F. failed to object to this statement during the administrative hearing, and the record does not include a transcript of the court's proceeding. Third, Dr. Demis' characterization of Dr. Gitt's opinion is largely cumulative given his statements that J.L.F.'s breasts had only a "slight asymmetry" and that her appearance would be improved only "slightly by increasing the left-sided fill."