NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

ARIZONA CARDINALS FOOTBALL CLUB, LLC, *Plaintiff/Appellant*,

*v.*

ARIZONA DEPARTMENT OF REVENUE, *Defendant/Appellee*.

No. 1 CA-TX 24-0003

FILED 12-11-2025

---

Appeal from the Arizona Tax Court
No. TX2023-000017
The Honorable Erik Thorson, Judge

**AFFIRMED**

---

COUNSEL

Gallagher & Kennedy, PA, Phoenix
By Kevin E. O'Malley, Mark C. Dangerfield
*Co-Counsel for Plaintiff/Appellant*

Spencer Fane, LLP, Phoenix
By Frank Crociata
*Co-Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Scot G. Teasdale
*Counsel Defendant/Appellee*

---

**MEMORANDUM DECISION**

Presiding Judge David B. Gass delivered the decision of the court, in which Judge Michael J. Brown and Judge Andrew J. Becke joined.

---

**G A S S**, Judge:

¶1       The Arizona Cardinals Football Team collects a Facility Use Fee from ticket purchasers for the Team's home games and events hosted at the facility. The superior court ruled the Fee constitutes gross income on which the Team must pay Arizona and the City of Glendale their Transaction Privilege Tax (TPT). The Team appeals the ruling, arguing the superior court mischaracterized the nature of the Fee and the relationship between the Team and the Arizona Sports and Tourism Authority. The court affirms.

## FACTUAL AND PROCEDURAL HISTORY

¶2       The State of Arizona established the Authority to promote and finance State Farm Stadium. A.R.S. § 5-802.D. As part of the financing, Arizona law authorizes the Authority to impose a facility use fee. The Authority adopted the Fee, a facility use fee, "to be collected in conjunction with the sale of Tickets for events held at the Facility." The Fee Agreement says the Fee is "[i]n lieu of parking charges for the Facility Parking Spaces and City Supplied Spaces." The Authority uses the monies it receives from the Fee to service the bonds used to finance the Stadium.

¶3       The Team and the Authority entered into multiple agreements in 2005 related to the construction and operation of the State Farm Stadium in Glendale, Arizona. Three of those agreements relate to the Fee: (1) the Amended and Restated Cardinals Use Agreement, (2) the Facility Use Fee Agreement, and (3) the FUF Trust Agreement. The three Agreements dictate how the Team collects and distributes the Fee.

¶4       The Use Agreement requires the Team to play all its home games at the Stadium. In the Use Agreement, the Team acknowledged its home game obligation was key to the Authority developing the Stadium and Glendale providing certain infrastructure and parking.

¶5       The parties entered into a separate parking agreement allowing a Team affiliate, Stadium LLC, to "own and retain all parking

revenues (except for the Net Facility Use Fees and Authority Tax Revenues, if applicable) with respect to parking at the Facility in connection with Home Games." The Team controls ticket sales for its home games, including pricing, advertising, and distributing the tickets. Except for the Fee, all revenue from those ticket sales belongs to the Team. The Team does not collect the Fee on complimentary tickets, but as discussed in the next paragraph, the Team must pay the Fee if it distributes complimentary tickets above certain contractual limits.

¶6            The Team must collect the Fee from ticket purchasers for the Team's home games and tickets sold through the Stadium box office for non-Team events. The Arizona Department of Revenue did not include the funds the Team collected for non-Team events as being TPT taxable because the Department presumes non-Team Fees would be taxable to the business selling the tickets, not the Team. The Team must pay the Fee for any complimentary tickets more than the limit in section 6.2 of the Use Agreement.

¶7            The Trust Agreement controls what the Team does with the Fee. First, it deposits the monies for the Fee into its accounts with all other revenue. Then it transfers all Fees collected into a Fee Trust Account on the same day. Once the Team plays the game, the Team transfers the Fee to the Authority. The Authority possesses all rights, title, and interest on the monies transferred to the Fee Trust Account.

¶8            During an audit, the Department discovered the Team had not been paying Arizona's TPT on the Fee from ticket sales. The Department sent the Team a Notice of Proposed Assessment on January 27, 2017, saying the Team owed the Department $1,300,489.82 under the Arizona TPT, and owed Glendale $397,460.82 under its TPT.

¶9            In the superior court, the Team disputed the Department's assessment, arguing the Fee is not income because the Team is acting as the Authority's agent when it collects the Fee. The superior court disagreed, finding the fees are part of the Team's gross receipts, and the Team must include it in their tax base.

¶10           The court has jurisdiction under Article VI, Section 9, of the Arizona Constitution, A.R.S. §§ 12-120.21 and 12-2101.A.1.

**DISCUSSION**

¶11           The "court reviews a grant of summary judgment *de novo*, viewing the facts and reasonable inferences in the light most favorable to

the party opposing the motion and will affirm for any reason supported by the record, even if not explicitly considered by the superior court." *CK Fam. Irrevocable Tr. No. 1 v. My Home Grp. Real Est. LLC*, 249 Ariz. 506, 508 ¶ 6 (App. 2020) (as amended). Summary judgment is appropriate when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a).

¶12 The court reviews questions of statutory interpretation *de novo. J.L.F. v. Ariz. Health Care Cost Containment Sys.*, 208 Ariz. 159, 161 ¶ 10 (App. 2004). A statute's plain language guides its interpretation. *See Ariz. Advoc. Network Found. v. State*, 250 Ariz. 109, 114 ¶ 19 (App. 2020). If the plain language is unambiguous, the court "must give effect to that language without employing other rules of statutory construction." *Parsons v. Ariz. Dep't of Health Servs.*, 242 Ariz. 320, 323 ¶ 11 (App. 2017). The court "give[s] terms their ordinary and commonly accepted meaning, unless the legislature has provided a specific definition." *JH2K I LLC v. Ariz. Dep't of Health Servs.*, 246 Ariz. 307, 310 ¶ 9 (App. 2019). Only if a tax statute is ambiguous does the court construe it liberally for the taxpayer. *Brink Elec. Constr. Co. v. Ariz. Dep't of Revenue*, 184 Ariz. 354, 358 (App. 1995).

¶13 When determining a statute's plain meaning, the court looks "to the statute as a whole and . . . may also consider statutes that are *in pari materia*—of the same subject or general purpose—for guidance and to give effect to all of the provisions involved." *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017). "City charters and ordinances are to be construed by the same rules and principles which govern the construction of statutes." *Rollo v. City of Tempe*, 120 Ariz. 473, 474 (1978) (citation omitted).

I. **Arizona broadly defines gross income for TPT and expressly includes admission or user fees as income under the amusement classification.**

¶14 The Fee is a user fee. The Team and the Authority even call it a "Facility Use Fee" in their Agreements. Still the Team argues the Fee is not gross income under Arizona's TPT. The Team also challenges whether the Fee is subject to Glendale's TPT. The court addresses Glendale's TPT in section IV below.

¶15 To begin, the Team challenges the superior court's use of the statutory "gross receipts" definition. The Team is correct. That definition applies to the retail classification, not to the amusement classification. *See* A.R.S. § 42-5001.7. The Team falls under the TPT's "amusement

4

classification" because it conducts sporting events. *See* A.R.S. § 42-5073.A. That point made, the court need not rely on that definition.

¶16 The court instead looks to the statutory definition of "gross income" (which already encompasses the term "gross receipts") because "[t]he tax base for the amusement classification is . . . gross income derived from the business . . . ." A.R.S. § 42-5073.B; *see also* A.R.S. § 42-5001.4 (defining gross income as "**gross receipts** of a taxpayer derived from trade, business, commerce or sales and the value proceeding or accruing from the sale of tangible personal property or service, or both, and without any deduction on account of losses.") (emphasis added).

¶17 "Gross income" applies to all business classes including the amusement classification. *Id.*; *see also* A.R.S. § 42-5073.A. Gross income under the TPT for the amusement classification expressly includes revenues derived from "admission or user fees." A.R.S. § 42-5073.A. The legislature also said the amusement classification includes, "any revenues derived from any form of contractual agreement for rights to or use of premium or special seating facilities or arrangements." *Id.*

¶18 Because the Arizona legislature defined gross income, the court declines the Team's invitation to apply a plain and ordinary meaning to that term. *See JH2K I LLC*, 246 Ariz. at 310 ¶ 9. Instead, the court will use the legislature's unambiguous words to resolve this matter. *Parsons*, 242 Ariz. at 323 ¶ 11.

¶19 In interpreting the TPT statutes, the Team argues the court should construe them liberally in the Team's favor. *See Brink*, 184 Ariz. at 358. The *Brink* reasoning, however, applies only when the court interprets ambiguous tax statutes. *See id.* ("However, if the statute grants a tax exemption, we must construe it strictly against the exemption.") (citing *Kitchell Contractors, Inc. v. City of Phoenix*, 151 Ariz. 139, 144 (App. 1986)). The Team does not argue the gross income definition under the TPT's amusement classification is ambiguous. The court thus will not apply that rule of statutory construction. The court also need not examine the exceptions outlined in A.R.S. § 42-5073.B because the Team does not rely on any of them.

¶20 The Fee thus presumptively is subject to the TPT. Arizona law presumes "all gross proceeds of sales and gross income . . . from business activity classified under a taxable business classification . . . until the contrary is established." A.R.S. § 42-5023. The Legislature expressly adopted this presumption "[f]or the purpose of proper administration of

this article and to prevent evasion of the tax imposed by this article . . . ." *Id.* Without facts to the contrary, the plain language of each of the relevant TPT statutes supports concluding the Team's tax base includes the total proceeds from ticket sales, including the Fee. As explained below, the Team's arguments do not overcome that presumption.

**II.    The money the Team collects for the Fee is gross income because the Team incurs it as an expense in its business operations.**

¶21         The Team argues the Fee falls outside the statutory definition of gross income because the Fee is not an expense of the Team's business operations. To back up its argument, the Team narrowly describes its business operations:

> Football games played at the Stadium involve at least two separate operations: the business of the Team, which plays its home games in the Stadium and earns money by selling tickets and concessions, and [the Authority's] business, as a government entity, to construct, own, maintain and promote the Stadium and pay the bonds issued to finance it. To correctly assess the Team's tax base, the Court must separate the Team's football business from [the Authority's] operations.

¶22         The Agreements themselves dispel the Team's narrow definition. For example, the Agreements establish the Team's obligations for the Fee are in exchange for the Authority giving the Team control over parking at the Facility for home games and giving the Team all the parking proceeds. The Team and the Authority expressly agreed on that point. The Team makes several arguments to avoid that reality.

¶23         First, the Team argues the Fee is not an expense because the Authority unilaterally imposed it. But that is true of any expense. Even if the parties negotiate the amount of a fee, one side is seeking the fee and the other side is paying it. For example, a seller may impose a processing fee on a buyer. The unilateral imposition of that fee as an expense does not make it any less an expense. The Authority established the Fee. The Agreements here, like any other contract, establish the Team's obligation to pay the Fee to the Authority. The Team's decision to agree to the contractual terms about its duty to collect and pay the Fee are what make it an expense, no matter how and why the Authority sought the Fee.

¶24         Second, the Team argues the Fee is not an expense because the ticket buyers pay the Fee and the Team just passes it onto the Authority.

But the Team must pay the Fee even if it does not separately collect it from the ticket buyer. The Agreements say the Team must pay the Fee to the Authority for each ticket it sells for home games even if it rolls the Fee into the ticket price. Additionally, the Team must pay the Fee if it gives away more tickets than the Agreements allow. At bottom, how the Team handles collecting and processing the Fee does not mean the Fee is not an expense of the Team's business operations.

¶25        Third, the Team relies on its accounting practices to avoid TPT liability. The Team argues the Fee is not gross income because "[t]he Team does not book collateral [Fees] as either revenue or expenses." The Team also relies on the Agreements to say the Team has no interest in the Fee. But the Team cannot use its accounting practices to avoid TPT tax liability. And the Agreements undermine the Team's argument. The Authority does not always get the Fee. Indeed, the Agreements allow for a scenario in which the Team's affiliate, Stadium LLC, gets some of the Fee. The Fee Agreement defines "Released Team Facility Use Fee" as "amounts paid to Stadium LLC . . . pursuant to the Authority Schedule . . . ." "Any amounts returned to Stadium LLC . . . by the Trust Account Trustee . . . remain the sole and exclusive property of the recipient . . . ." In other words, the balance of the Fee account is not strictly a pass-through to the Authority. The Team also may collect it as income for the Team's affiliate.

¶26        Based on the above, the Fee is gross income to the Team, who then pays it to the Authority as an incurred expense as part of its business operations at the Stadium. The Team pays the TPT under the amusement classification. A.R.S. § 42-5073.A. That classification expressly includes "admission or user fees" in the tax base and says the amusement classification includes, "any revenues derived from any form of contractual agreement for rights to or use of premium or special seating facilities or arrangements." *Id*. And the Team derives that revenue from the negotiated Agreements between the Team and the Authority.

III.    **Agency principles do not shield the Team from TPT liability for the Fee.**

¶27        The Team attempts to avoid the consequences of the statute's plain language by arguing it is merely the Authority's agent for purposes of collecting the Fee. The Department correctly argues the authorities the Team relies on do not apply to these facts.

¶28        "[A]gency is the 'fiduciary relation which results from the manifestation of consent by one person to another that the other shall act

on his behalf and subject to his control, and consent by the other so to act.'" *In re Sky Harbor Hotel Props., LLC*, 246 Ariz. 531, 533 ¶ 6 (2019) (quoting Restatement (Second) of Agency § 1(1) (A.L.I. 1958)). An agency relationship depends on (1) a manifestation of consent to act on behalf of another, and (2) a right of control. Restatement (Second) of Agency § 1 (A.L.I. 1958).

¶29        In limited circumstances, courts have held a business's tax base would not include funds because of an agency relationship. *See Ariz. Dep't of Revenue v. Ormond Builders, Inc.*, 216 Ariz. 379, 384 ¶ 19 (App. 2007) (distinguishing how "the [TPT] statutes do not address the legal relationship between a principal and an agent," but is apparent in "the relationships among [the parties]" themselves). For that reason, the existence of an actual agency relationship generally is a question of fact and becomes a legal question only if all material facts are undisputed. *Ruesga v. Kindred Nursing Ctrs.*, L.L.C., 215 Ariz. 589, 595 ¶ 21 (App. 2007). The material facts here are undisputed.

### a. The Agreements expressly disclaim an agency relationship.

¶30        The Team argues the Authority established an agency relationship because the Team (the putative agent) acts for the Authority's benefit by collecting monies for the Authority (the putative principal). *See* Restatement (Second) of Agency § 1 (A.L.I. 1958). But "[t]here are many relations in which one acts for the benefit of another which are to be distinguished from agency by the fact that there is no control by the beneficiary." Restatement (Second) of Agency § 14 cmt. c. (A.L.I. 1958). The terms of the Agreements do not give the Authority control over the Team. In fact, the express terms of all three Agreements undermine the Team's claim of Agency:

1. The Fee Agreement, ¶ 8.1, says the Stadium (the Team's affiliate) and their respective employees, agents, contractors and guests shall not be considered employees or agents of the Authority.

2. The Use Agreement, ¶ 21.1, says the Team, Stadium LLC and their respective employees, are not agents of the Authority.

3. The Trust Agreement, ¶ 11.4, establishes says no partnership, joint venture, or agency between any Party and any other Party either under this [Trust] Agreement or any other agreement referred to in this Agreement.

¶31        Based on the Agreements' express terms alone, the parties did not establish a contractual agency relationship.

### b. The Team cannot argue their TPT liability does not exist based on agency.

#### i. The Team's relationship with the Authority is materially different from the agency relationships in the cases on which the Team relies.

¶32        The Team relies on three cases to argue the Fee is not part of its tax base under this theory: (1) *Ariz. Dep't of Revenue v. Ormond Builders, Inc.*, 216 Ariz. 379 (App. 2007); (2) *Ebasco Servs. Inc. v. Ariz. State Tax Comm'n*, 105 Ariz. 94 (1969); and (3) *Ariz. State Tax Comm'n v. Parsons-Jurden Corp.*, 9 Ariz. App. 92 (1969). Setting aside the plain statutory language and the express terms of the Agreements, undisputed factual distinctions undermine the Team's agency argument under Arizona taxes cases involving actual agency relationships.

¶33        The Team first misplaces its reliance on *Ormond*. In *Ormond*, the court concluded payments Ormond made to trade contractors on behalf of 2 school districts were not part of Ormond's tax base. *Ormond Builders, Inc.*, 216 Ariz. at 390 ¶ 53. The crux of the decision was the fact the schools, not Ormond, were legally obligated to pay the contractors. *Id.* at 388 ¶ 40. Ormond's lack of payment obligation meant Ormond was merely the schools' agent, and just because the schools' monies "pass through [Ormond's] hands" did not mean the Department could include those monies as part of Ormond's taxable income. *Id.* at 387 ¶ 35.

¶34        Unlike Ormond, the Team must pay the Fee to the Authority. The Authority contracted with the Team, not the ticket users, to pay the Fee to the Authority. The Team collects the Fee as part of its revenue from ticket sales and then pays the Fee to the Authority as part of the expense to use its venue. The Team also must pay the Fee if it gives away more tickets than allowed under the Agreements, even when it does not collect the Fee from the users who receive the free tickets. Considering these material distinctions, the court cannot adopt the *Ormond* reasoning here.

¶35        *Ebasco* also does not support the Team's argument. The court here does not face an ambiguity for which it should construe a statute "liberally in favor of the taxpayer and strictly against the state." *Ebasco Servs Inc.*, 105 Ariz. 94, 97 (1969) (citation omitted). In *Ebasco*, the Arizona Supreme Court declined to rule the disputed funds were part of the taxpayer's gross receipts. *Id.* at 97–98. The Arizona Supreme Court decided

the issue based on evidence of the taxpayer's business structure and how the disputed receipts came from a separate "purchasing agent" division. *Id.* Considering this transactional structure and a now-repealed statutory deduction for purchasing agency contracts, the Arizona Supreme Court ruled the funds were not a part of gross receipts. *Id.*

¶36 In contrast, this appeal involves no such transactional structure or applicable statutory deduction. First, the Agreements expressly deny the existence of an agency relationship. Second, the Team has not argued the fees are a part of statutory deductions. The Team collects the Fee as part of its ticket sales process to pay its contractual obligation to the Authority. The Team's collection of the Fees to pay the Authority thus is materially distinct from the purchasing agent's receipt and disbursement of funds in *Ebasco*.

¶37 Finally, *Parsons-Jurden* found the taxpayer's work as a purchasing agent fell outside the retail sales tax classification. *See Parsons-Jurden Corp.*, 9 Ariz. App. 92, 94 (1969). For the same reasons as *Ebasco*, *Parsons-Jurden* also does not support the Team's appeal. The Team acknowledges ticket sales are essential to their business. And the Team serves as more than an agent for the Authority for the Fee because it also is a potential beneficiary of the monies collected. The Team cites no authority in which a taxpayer avoided tax liability for receipts when it retained a residual interest in those monies.

¶38 The cases cited by the Team are materially distinct from this case, and the circumstances of the team's affiliate provide more reasons to reject the Team's agency argument. At bottom, the Team cannot deduct an expense from its gross income. *See* A.R.S. § 42-5001.7.

### ii. The Fees are not pass-through funds because the Agreements give the Team's affiliate a potential interest in the Fee.

¶39 Under the Agreements, the Authority does not always get the Fee. Indeed, the Agreements allow for a scenario where the Team's affiliate, Stadium LLC, gets some of the Fee.

¶40 The Fee Agreement defines "Released Team Facility Use Fee" as "amounts paid to Stadium LLC . . . pursuant to the Authority Schedule . . . ." "Any amounts returned to . . . Stadium LLC by the Trust Account Trustee . . . remain the sole and exclusive property of the recipient . . . ." In other words, the balance of the FUF account is not strictly

a pass-through to the Authority but may also be collected as income for the Team's affiliate.

### iii. The context behind the Authority imposing the Fee "in lieu" of another expense shows the Fee as a taxable expense, which the Team may not contractually remove from its tax base.

¶41  The parking terms in the Agreements undermine the Team's position that it only collected Fees as the Authority's agent. The Authority and the City agreed to develop and construct the facility, including parking, because the Team agreed to play all home games at the Stadium. The Authority then adopted the Fee "in lieu" of charging for parking at home games and team events.

¶42  Instead, the Team and the Authority agreed a Team affiliate would "own and retain all parking revenues (except for the Net Facility Use Fees and Authority Tax Revenues, if applicable) with respect to parking at the Facility in connection with Home Games and Team Events." The Use Agreement thus establishes the Fee constitutes parking revenue, and the Team must pay the portion of the parking revenue to the Authority.

¶43  In lieu of the Authority handling the parking, the Authority and the Team agreed on how the Team would handle the Fee. The Team handles the parking at the Facility, gets to keep all the parking proceeds, and must collect the Fee from the users. By the Team's own words, the Fee is part of the parking revenue and thus part of the Team's tax base. This finding is consistent with the general principle a "[t]axpayer is allowed to lower the tax base only with 'cash discounts'—not with fees it pays to its vendors as part of the cost of doing business." *Home Depot USA, Inc. v. Ariz. Dep't of Revenue*, 230 Ariz. 498, 503 ¶ 23 (App. 2012).

¶44  Even if the Agreements did not undermine the Team's argument to such a great extent, the Team may not avoid tax liability through contractual labels. A tax statute "measures tax liability by the scope of the business; that it is by the substance of what is done rather than by some tenuous standard such as the form of the contract." *Ebasco Servs. Inc.*, 105 Ariz. at 98. The Team cannot contract around its TPT liability. Instead, the court must recognize the true substance of the Team's actions when assessing whether the Fee falls within the Team's tax base. It does.

**IV.     The Fees also are taxable under Glendale's TPT.**

¶45        The City of Glendale also imposes a transaction privilege tax of "two and nine-tenths percent (2.9%) of the gross income from the business activity upon every person engaging or continuing in the business of providing amusement that begins in the city or takes place entirely within the City[.]" GLENDALE, ARIZ., CODE § 21.1-410.a. Like the Arizona TPT, the city code imposes a TPT on gross income "derived from the business." *Id.*; *see also* A.R.S. § 42-5073.

¶46        The Team does not argue the language in the city code differs from the similar language in Arizona's TPT statutes. Indeed, the Team's entire argument appears in a footnote on page 15 and reads:

> Although the fact summary in the tax court's ruling quoted Glendale's definition of "gross income," the court's legal analysis doesn't mention that definition and simply looked to A.R.S. § 42-5001(7). But the definition in the Glendale Code of Ordinances also limits taxable "gross income" to "gross income from the business," and to receipts "derived from" a taxable activity. As argued in this brief, collecting fees as an agent for another company does not yield gross income "from the business" and is not a taxable activity.

¶47        For the same reasons the Team must pay the Arizona TPT on the Fee, it also must pay the Glendale TPT on the Fee.

## ATTORNEY FEES AND COSTS

¶48        The Team seeks an award for the fees and costs they incurred under A.R.S. § 12-348.B.1. Under this statute, the court may award fees and other expenses to the Team if they prevail on their challenge against the Department. *See* A.R.S. § 12-348.B.1. Because the Team is not the prevailing party, the court denies their request.

## CONCLUSION

¶49        The court affirms.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:          JR